[Crim. No. 6138.   First Dist., Div. Four.   Jan. 17, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RAUL LOPEZ HEREDIA, Defendant and Appellant.

Lawrence A. Mayer, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

CHRISTIAN, J.—Defendant appeals from a judgment of conviction of conspiracy to commit violations of the narcotics laws. Appellant was jointly charged with a number of codefendants. He was found guilty, in a nonjury trial, on a single count of the information which charged conspiracy to violate Health and Safety Code, section 11501 (sale or furnishing of narcotics), and Health and Safety Code, section 11912 (sale or furnishing of dangerous drugs). On appeal it is contended that the evidence was not sufficient to support the finding of guilt and that the court erred in rejecting testimony as to the results of a search which the police made of appellant's home after he was arrested.

On September 20, 1965, Deputy Moreno of the narcotic detail of the Los Angeles sheriff's department was conducting undercover investigations in collaboration with an informer named Sam Wright. Deputy Moreno, dressed in plain clothes, met the informer at a Long Beach hotel during the evening and was introduced by him to Stillwell, who was later charged as appellant's coconspirator. The informer asked Stillwell if he had any ''whites.''[1] Stillwell said he had none but offered

---

[1] ''Whites'' is a drug-user's argot for amphetamine sulfate, a restricted dangerous drug within the provisions of Health and Safety Code, section 11912 (see section 11901, subdivision (b) for definition).

to get some the next night. After Stillwell made a telephone call, apparently to confirm the availability of a supply, there was brief haggling followed by agreement that the price would be $50 for 1,000 tablets.

The next evening Deputy Moreno, having made arrangements for surveillance of the anticipated transaction by other officers, met Stillwell and the informer. Stillwell received $50 in recorded currency and then pointed out as the ''connection'' defendant Arellanes who was standing nearby. Stillwell approached Arellanes, who then entered an automobile. Stillwell asked Arellanes to get some heroin for him, in addition to the ''whites'' he was to get for Deputy Moreno.

Deputy Moreno and the informer also went over to the car. The deputy complained that he should not have to trust Arellanes to complete the transaction, and Arellanes therefore allowed him to come along. Arellanes stopped several times to make telephone calls, but finally proceeded to a point in East Los Angeles where he left the car, walked around the corner out of sight, and returned in approximately five minutes with a small paper ''bindle'' of heroin which he kept for later delivery to Stillwell.

Arellanes then wanted to take the heroin immediately to Stillwell, but Deputy Moreno prevailed on him to continue and procure the tablets. Accordingly, Arellanes and Deputy Moreno drove to a second location in East Los Angeles where Arellanes again left the car, walked out of the deputy's sight, and returned in a few minutes carrying something ''under his left arm, underneath his sweater.'' Arellanes and Deputy Moreno then returned to the parking lot where Stillwell was waiting. En route Arellanes informed Moreno that if he ''wanted to score again'' he should contact either Stillwell or himself. When they arrived at the parking lot, Arellanes delivered the paper bindle of heroin to Stillwell and gave Deputy Moreno the other parcel, a brown paper sack containing 1,000 amphetamine sulfate tablets.

Appellant's first appearance in the story is in the testimony of an officer who followed Deputy Moreno to keep him under surveillance during the intended purchase. When Arellanes and Deputy Moreno made their second stop, this officer was able to observe Arellanes walk around the corner and meet appellant on the sidewalk in front of a house. Arellanes and appellant talked briefly, the two men extended their arms as if they were exchanging articles, and Arellanes returned to the car in which Deputy Moreno was waiting. The witness

saw appellant return to a house which was later identified as appellant's own residence.

Arellanes and Stillwell were arrested as soon as the heroin had been delivered to Stillwell and the amphetamine sulfate to Deputy Moreno. An officer then arrested appellant on the front porch of his house. A search of Arellanes' person produced $15 of the recorded currency. The remaining $35 was found on appellant's person.

Appellant testified that he did not sell either narcotics or dangerous drugs to Arellanes. He admitted that Arellanes came to his house and paid $40 to reduce an old personal debt but claimed that this transaction took place inside the house and denied being outside the house with Arellanes as the observing officer had testified.

Appellant's first contention is that the evidence is insufficient. The Attorney General justly concedes that there is no evidence of appellant's participation in a conspiracy to sell heroin in violation of Health and Safety Code, section 11501. The bindle of heroin was obtained by Arellanes at the first stop made by him and Deputy Moreno; appellant was not connected with that transaction in any way. Penal Code, section 182 provides that a conspiracy to commit a felony is "punishable in the same manner and to the same extent as is provided for the punishment of said felony." Thus appellant has been committed for a term of five years to life, a minimum of three years of which must be spent in prison (Health & Saf. Code, § 11501) but the evidence shows at most a conspiracy to sell a restricted dangerous drug, an offense punishable by imprisonment in the county jail not exceeding one year or in the state prison for a period of from one to five years.

Appellant's position is that the evidence does not show him to have been guilty of any conspiracy at all. The elements of a conspiracy are an agreement between two or more persons to commit a crime, entered into with specific intent to commit that crime, followed by some overt act in implementation. (*People* v. *Smith* (1966) 63 Cal.2d 779, 793 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116].) But the existence of a conspiracy can be established by circumstantial evidence. (*People* v. *Aday* (1964) 226 Cal.App.2d 520, 534 [38 Cal.Rptr. 199].) In the present case the several telephone calls made by Arellanes might be inferred to

have been for the purpose of arranging for the delivery of the 1,000 capsules of amphetamine sulfate which Deputy Moreno desired to buy. This involved an agreement with someone to supply contraband in order that Arellanes might make a sale to Deputy Moreno. An eyewitness observed a transaction between Arellanes and appellant, following which Arellanes had in his possession a bulky package of tablets which he did not have before. Also, following the transaction, recorded currency was found in appellant's possession. This evidence points to appellant as the person with whom the agreement had been made. Appellant's guilt could thus reasonably be inferred from these facts alone; however, there was more: the trier of fact could reasonably have believed the testimony of the eyewitness officer regarding the sidewalk transaction between appellant and Arellanes. Appellant's false denials that such an event occurred have a tendency to discredit his exculpatory testimony and show guilty knowledge.

Appellant relies upon *People* v. *Barnett* (1953) 118 Cal. App.2d 336 [257 P.2d 1041], where the only evidence connecting appellant with the provenance of narcotics, actually delivered to an officer by an unnamed informer, was appellant's possession of recorded currency. In *People* v. *Morgan* (1958) 157 Cal.App.2d 756 [321 P.2d 873], the chain of possession of the contraband was incomplete. There are two crucial distinctions between the present case and the cases relied on by appellant. First, in the present case the identity of the informer was disclosed; second, there was eyewitness testimony concerning the sidewalk transaction between appellant and Arellanes. We have concluded that there was sufficient evidence to support appellant's conviction of conspiracy to sell a restricted dangerous drug.

■  On cross-examination of the officer who arrested appellant, defense counsel asked questions designed to show that appellant's house had been searched after the arrest and no contraband found therein. The court sustained an objection that the line of inquiry was immaterial. The same objection was sustained as to proffered testimony by appellant's wife regarding a search of the house. The theory of admissibility was that if the house was searched and no contraband was found, this is "negative evidence" of appellant's innocence in that it would be "strange that he had the exact number of amphetamine sulfate tablets on his person with no apparent source of supply. . . ." The acceptance or rejection of such "negative evidence" is largely within the discretion

of the trial court. The general rule is that "negative evidence lacking in probative value is properly excluded as too speculative in nature." (*People* v. *Mehaffey* (1948) 32 Cal.2d 535, 555 [197 P.2d 12].) The evidence could not have been strongly probative in the circumstances here presented. If a search disclosed no contraband several possibilities exist other than that pointed to by appellant: a further supply of contraband may have been present in the house and not been found; the particular transaction may have exhausted appellant's supply; a cache of contraband may have been maintained by appellant outside the house; appellant may have obtained the 1,000 tablets from another supplier in response to Arellanes' advance request made by telephone. The judge did not abuse his discretion in excluding the evidence in question.

The sentence must be modified so as to determine that appellant was guilty of conspiracy to sell a restricted dangerous drug in violation of Health and Safety Code, section 11912. The trial judge declared that he denied probation not because under Health and Safety Code, section 11501 appellant was ineligible but upon "consideration of the entire case and all the relevant facts." One of the "relevant facts" was the erroneous determination the court had made regarding the alleged conspiracy to sell heroin; moreover, a further sentencing option now emerges that clearly was not considered by the judge: upon a first conviction of violation of Health and Safety Code, section 11912, a county jail sentence is permissible. The judgment is therefore reversed and appellant is remanded to be rearraigned for reconsideration of the application for probation and for pronouncement of judgment. The purported appeal from the order denying motion for new trial is dismissed.

Devine, P. J., and Rattigan, J., concurred.