514 P.2d 480

The STATE of Arizona, Appellee,

v.

Edward Lewis JACKSON, Appellant.

No. 2323.

Supreme Court of Arizona,
In Banc.

Sept. 28, 1973.

**560**

Gary K. Nelson, Atty. Gen., by William P. Dixon, Asst. Atty. Gen., Phoenix, and Frank Galati, Law Student, for appellee.

Ross P. Lee, Maricopa County Public Defender, by Roger H. Lichty, Former Deputy Public Defender, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from jury verdicts and judgments of guilt to the crimes of rape, first degree, § 13–611 subsec. A A.R.S., and aggravated battery, § 13–241 subsec. B and § 13–245 subsec. A, par. 3 A.R.S., and sentences of not less than 20 nor more than 21 years for the rape and not less than 2 nor more than 5 years on the aggravated battery charge.

We are asked to answer the following questions on appeal:

1. Was it error to grant the County Attorney's motion for a continuance?
2. Was it error for the County Attorney to fail to disclose to the defendant matters contained in the police investigation report?
3. Did the court err in denying the defendant's motion for new trial based on newly discovered evidence?

The facts necessary for a determination of this matter on appeal are as follows. On the evening of 6 October 1970, at approximately 10:00 p. m., the victim was alone at home with her five year old daughter and three year old son. Her husband was away at school. The victim was taking a bath when she heard a knock at the door. She instructed her five year old daughter to "see who it was." According to her testimony:

"Q What was the next thing that happened?

"A Well, she left the bathroom and then, all of a sudden there he was standing in the bathroom."

The victim testified that he was holding what looked like a knife and also a flashlight and he told the victim, "Lady get out of the tub. Don't scream or I'll kill you."

After she got out of the tub he demanded "money or pussy." She told him she didn't have any money and he hit her on the right side of the head, forced her to the floor of the bathroom, and wrapped a towel around her head. The victim was forced to lay on her stomach and at one time he choked her until as she stated "I thought I'd stopped breathing. Thought I was going to die right there and then. He let me go."

"Q What happened after he let you go?

"A Then he pulled me by the hair and told me 'you bitch, get down'."

The victim was forced to remain on her stomach and sexual intercourse was accomplished from the rear.

After the rape he forced the victim into her bedroom where he went through her purse taking several dollars. He then pulled her by the hair back into the bathroom, placed her in the tub and left. Immediately after this the three year old boy came in crying and screaming. The victim testified:

"Q What was his physical shape at that time?

"A Well, he had three . . . he had three, let's see, he had three marks of blood coming to the surface of his forehead right here (indicating), and his mouth was full of blood.

\* \* \* \* \* \*

"Q He said that the man had kicked him?

"A Yes, that the man had kicked him and so did the little girl."

The victim immediately called her husband and upon his return the police were called. After the arrival of the police and their preliminary investigation, the victim was taken to the hospital where an examination was made revealing the presence of spermatozoa in the vaginal cavity.

On the day after the rape, the victim selected a picture from a group of twelve photographs depicting a person that

"looked like" the defendant, and on 15 October a five-man lineup was held at which time the victim identified the defendant, Edward Lewis Jackson, as the assaultant.

A preliminary hearing was held 23 October 1970. The defendant was held to answer and trial was set in the Superior Court for 15 December 1970. At that time, because of a mix-up with this case and another case in which the defendant Edward Lewis Jackson was also a defendant, the State asked for a continuance which was granted over the objections of the attorney for the defendant. Trial was held before a jury commencing 29 December 1970.

At the trial the victim, the medical doctor, and two police officers testified for the State. The victim made a positive in-court identification of the defendant and testified regarding the lineup identification as follows:

"Q When you viewed this line-up, how many people were in the line-up itself?

"A Five.

"Q Were they all Negroes?

"A Yes, they were.

"Q Were they all generally about the same height?

"A They were around the same height, but they weren't the same height, no.

"Q Now, before you went into this line-up, did anyone indicate to you that . . . make any indication to you who you would see in that . . . yes or no?

"A No.

"Q While you were in there, did anyone say anything to you about there would be someone in there you should recognize?

"A No.

"Q And who was actually in the line-up with you at the time you looked at these five individuals?

"A Well, Mr. Farmer and I believe a policeman . . . there were more than just one person there. I'm not sure who they were.

"Q Now, when you walked into this room, did you . . . how long did it take before you recognized someone in that line-up?

"A I recognized him over there right away, immediately.

"Q Would you tell us just exactly the steps you went through from the time you walked in there?

"A Yes, they gave me instructions of what was going to happen and I went and so I recognized . . . as soon as I seen his face, I recognized him right away, but I went through and looked at each individual and then I identified.

"Q Now, you identified immediately from the way he looked, is that not correct?

"A Right, right away.

"Q Is there any other way you were able to identify this as being the particular man?

"A His voice.

"Q How did you do that?

"A Well, they had each one of the men that were in the line-up . . . and said something similar to the incident that night, individually as they were, one, two, all the way up to five.

"Q And you were able to recognize his voice, is that not correct?

"A Yes.

"Q I show you now what's marked State's Echibit No. 1 for identification and I ask you does this picture truly and accurately depict the scene of the line-up as you viewed it on the morning of October 15th of 1970 in this complex?

"A Yes, it is.

"Q And would you hold that picture up so the jury can see that picture and which man was it that you picked as being the defendant?

"A Number three.

"Q Now, is the number three, at this time, have anything different about him than he was at the time you saw him?

"A He has a little goatee and moustache."

And:

"Q Now, Mr. Fischer asked you a little while ago if seeing the defendant on these other two occasions aided you in identifying him today. Would you explain what you mean by that?

"A Sure. You look at a person and see him, it helps bring more into it, but I still wouldn't forget that face even after I went out of that line-up, it was like I could still see that face outside of the room yet. It's something you don't forget that easily.

"Q So, you're saying that if you see anybody several times, it's better than if you see them once?

"A Sure, you could get more of the clothing and more of them if you see them more.

"Q Now, if you were to say that you didn't see the line-up and you didn't see him at the Preliminary Hearing, would you still be able to, in your opinion, be able to identify this individual today?

"A Yes, I would . . . I would."

The police officer testified regarding the twelve pictures shown to the victim the day after the rape:

"Q At that time, did you have occasion to show her some pictures?

"A Yes, I did.

"Q Approximately, if you can remember, how many pictures did you show her?

"A Approximately a dozen pictures.

"Q Did you . . . strike that. When you showed her these pictures, did you just tell her to look and see if she recognized anyone?

"A Yes, I did.

"Q Was she able to pick someone out?

"A No, she said that the person was not in there.

"Q Was there a picture in that group of pictures of the defendant, Mr. Edward Lewis Jackson?

"A No, he was not in there.

"Q Did she make any statements to any of the pictures at all in maybe looking like . . .

"A She said one of them looked quite a bit like him.

"Q So, there was not a picture in there though of the defendant, is that not correct?

"A His picture was not in there."

The defendant did not testify, but three witnesses including the defendant's fiancee testified on his behalf. The defendant's fiancee testified that on the morning of 6 October the defendant had picked up his mother from work at the Arizona State Hospital and had then spent the rest of the day with her and that in the evening they had spent their time moving furniture into defendant's and his mother's new home, as well as visiting with friends. This testimony was supported by the two other defense witnesses.

In rebuttal to the alibi defense, the State obtained testimony from a bookkeeper at the State Hospital to the effect that the defendant's mother did not work on the night of the 5th and the morning of the 6th of October, the day the defendant allegedly picked up his mother from work.

The jury returned verdicts of guilty as to both charges and the defendant appeals.

## CONTINUANCE BY THE COUNTY ATTORNEY

Trial in the above matter was set for 15 December 1970, some 70 days after the

crime had occurred, and 36 days after the information was filed in the Superior Court. The jury panel was present but there had been no attempt to select a jury at that time, and there is no question that jeopardy had not attached. State v. Mojarro Padilla, 107 Ariz. 134, 483 P.2d 549 (1971); State v. Stout, 5 Ariz.App. 271, 425 P.2d 582 (1967). Defendant vigorously opposed the continuance and over defendant's objection the matter was set for 4 January 1971, and the other charge was set for 28 December 1970. On 18 December 1970, the instant case was reset to 28 December 1970 at which time it was tried.

 Defendant contends on appeal that it was prejudicial error for the trial court to grant the County Attorney's motion for a continuance. The Rules of Criminal Procedure, 17 A.R.S., applicable at that time, allow the court to grant a continuance for "good cause," but for no longer than justice requires. Rules 241 and 247, Rules of Criminal Procedure, 17 A.R.S. And Rule 236 of the Rules of Criminal Procedure provides for a dismissal "if he is not brought to trial for the offense within sixty days after the * * * information [is] filed." A continuance to a time within the sixty day period mandated by Rule 236 is presumptively nonprejudicial, and we find no abuse of the trial court's discretion in continuing the case for a time still within the sixty day trial period.

## FAILURE TO DISCLOSE POLICE INVESTIGATION REPORT

The defendant contends that the trial court erred in denying his motion to "set aside the verdict and dismiss with prejudice" because the State concealed a police report wherein the victim is reported to have stated she believed that the defendant had not had normal sexual intercourse with her, but instead made penetration into the anal cavity and also she was dubious of her ability to recognize her attacker if she saw him again. The defendant cites Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and State v. Fowler,

101 Ariz. 561, 422 P.2d 125 (1967) wherein we stated:

"A number of the state courts also have accepted in various forms the proposition that the prosecutor is under a duty to make disclosure of evidence in his possession which relates to the charges being brought against the defendant and that a conviction cannot stand when the prosecutor has either wilfully or negligently withheld material evidence favorable to the defendant. (citations omitted)

"In the present case we are faced with the question of whether the failure of the state to reveal the relevant physical evidence found at the scene of the crime constituted a denial of due process. That many courts have recently found that the state has an obligation to disclose certain types of evidence certainly seems just when the duties of the prosecution are considered in their proper perspective. Both prosecutors and the police, as public officers acting on behalf of the state, are sworn to uphold the law and are duty bound to protect the rights of the innocent as well as to prosecute the guilty. Their primary duty is not to convict, but to see that justice is done. Canon 5, Canons of Professional Ethics. A prosecutor who fails to reveal evidence that clearly would aid the accused's defense would seem to have lost sight of his proper objective. Should his failure be a deliberate attempt to employ defendant's unknowingness to the prosecution's own advantage, his actions would become particularly reprehensible. * * *" State v. Fowler, supra, 101 Ariz. at 563, 422 P.2d at 127.

At the hearing on the motion, after the verdict, the victim testified that she had her doubts at first but that after the examination and other events she realized that penetration had been made into the vaginal cavity. The testimony of the doctor concerning the presence of spermatozoa both at the preliminary hearing and at the trial supports this conclusion.

Penetration of the vulva, no matter how slight, is necessary before a person can be guilty of the crime of rape, § 13–612 A.R.S.; State v. Torres, 105 Ariz. 361, 464 P.2d 953 (1970); State v. Scott, 105 Ariz. 109, 460 P.2d 3 (1969), and penetration of the anal cavity alone will not support a conviction for rape. See Reynolds v. State, 274 Ala. 171, 146 So.2d 85 (1962) for a comprehensive citation of authority on this question as to what constitutes "carnal knowledge" and sexual intercourse.

The statement made by the complaining witness to the officer to the effect that she had her doubts whether the penetration was into the vulva was material because without penetration of the vulva the defendant, irrespective of what other offenses he might have committed, did not commit the crime of rape. The failure of the State to notify the defense of this was certainly error and we do not condone the potentially prejudicial conduct of the county attorney. State v. Fowler, supra. We believe, however, under the facts in the instant case that the error was harmless.

The harmless error rule announced by the United States Supreme Court in the cases of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), applied the doctrine of harmless error to constitutional or fundamental error in those cases wherein the error did not contribute to the verdict and was harmless beyond a reasonable doubt.

It should be kept in mind, however, that the harmless error rule is an appellate court rule and should not be applied where the error is of the type which could deceive the appellate court into thinking that the error was harmless when in fact it was not. In the instant case, were our record limited to the facts presented at the trial, we would have no way of knowing whether the action of the State in withholding this information was prejudicial. In the present case, however, these facts are not concealed from the appellate court, for at the hearing on the motion to set aside the verdict and to dismiss the case, the victim not only testified but was cross-examined as to information contained in the withheld report. Also, the examining physician testified at this hearing and cross-examination was allowed. From the testimony of the victim at that hearing, as well as that of the examining physician, it is clear that, even though the victim had some doubts at first because of the way in which the rape was accomplished, her testimony at trial would have been consistent on this point with the verdict if cross-examined on the contents of the report. We therefore hold that, based upon the testimony adduced at the motion to set aside the verdict and dismiss, the failure to make available to the defendant the allegedly beneficial information contained in the police report was harmless and did not, beyond a reasonable doubt, contribute to the verdict. Chapman v. California, supra.

As to the identification of the defendant, it is apparent from the testimony that the victim had ample opportunity to observe the defendant and was able to identify him at the lineup and at the trial. Though she may have had some doubts at the time she talked to the officer immediately after the event, once she did see the defendant again her identification was instantaneous and positive.

## NEWLY DISCOVERED EVIDENCE

The defendant in his alibi defense presented testimony by the defendant's fiancee who stated that the defendant was with her all day the day of 6 October and that she first saw the defendant that morning "after he went to pick up his mother from work." On cross-examination by the State, she said:

"Q I understand that. Okay, let's go down to . . . let's start on October 6, okay, and in the morning hours, I believe you said that you saw Eddie, the Defendant here, on that morning, didn't you?

"A After we went to pick his mother up.

"Q After you went to pick his mother up. Did you see him before that?

"A No, I didn't.

"Q And he went to pick up his mother, is that correct? And do you know where he went to?

"A Arizona State Hospital.

"Q She worked that day, didn't she?

"A Yes.

"Q Did she tell you that?

"A Did she tell me that?

"Q Yes.

"A No, she didn't have to tell me.

"Q Okay. Now, tell me what happened, what time was that?

"A Let's see . . . I think she got off about . . . I don't know, 7:00 or 8:00.

"Q Now, if I were to tell you his mother didn't work that day, would that change your story and that possibly these events happened on some other day . . . is it possible these events could have happened the next day?

"A (No audible response.)

"Q No, you are sure of that?

"A That's right.

"Q You are positive that this was on October 6th, the day you are talking about?

"A The day we moved."

On rebuttal testimony the State presented an employee of the Arizona State Hospital, Finance Department, Payroll Division, who testified that the time cards indicated that the defendant's mother did not work that night.

The motion for new trial on newly discovered evidence was based on the testimony produced at the hearing of the Comptroller of the hospital who testified that the defendant's mother did indeed work that night before. Rule 310 of the Rules of Criminal Procedure, 17 A.R.S., applicable at the time this trial took place, states:

"The court shall grant a new trial if any of the following grounds is established:

\* \* \* \* \* \*

"(3) That new and material evidence, which if introduced at the trial would probably have changed the verdict or the finding of the court, is discovered which the defendant could not with reasonable diligence have discovered and produced upon the trial."

Whether or not the mother was picked up at the Arizona State Hospital on the morning of 6 October is not material to the issue before this court. The rape occurred between 10 and 10:30 p. m. that night, and while the rebuttal testimony might indicate that the witness was mistaken on this point, it does not mean that the witness is necessarily mistaken on the question of the whereabouts of the defendant at the time the rape occurred. The trial judge and the jury were able to observe the demeanor of the witnesses and were able to draw their own conclusions.

We have stated:

"We have held that a new trial for newly-discovered evidence is required if the introduction of the evidence at the trial would probably have changed the verdict, and if the defendant could not, with reasonable diligence, have discovered and produced it upon the first trial. (citations omitted) The alleged newly-discovered evidence on a collateral issue was to be used solely for the purpose of impeaching the state's witness. It does not go to the proof or disproof of the crime charged. The general rule in this state is that a new trial will not be granted based on any discovered evidence which is merely impeaching. Such evidence does not have a substantial probability of changing the verdict. The court below did not err in denying the new trial." State v. Thurston, 100 Ariz. 297, 302, 413 P.2d 764, 767 (1966). See also State v. Sims, 104 Ariz. 118, 449 P. 2d 289 (1969).

· We agree with the minute entry which states:

"As to Paragraph I, THE COURT FINDS THAT the newly discovered evidence offered by defendant in support of his motion for New Trial is insufficient to warrant the granting of such a motion.

"The Court bases this opinion on the fact that the defense offered at trial by defendant insofar as the new evidence is concerned, was in the form of alibi testimony from several witnesses. The newly discovered evidence offered by defendant in support of a Motion for New Trial neither confirms nor disproves the alibi testimony nor does it establish a new defense."

We find no error.

Judgments affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.