526 P.2d 720

The STATE of Arizona, Appellee,

v.

Mark Daniel KELLY, Appellant.

No. 2889.

Supreme Court of Arizona,
In Banc.

Sept. 23, 1974.

Rehearing Denied Nov. 13, 1974.

Gary K. Nelson, Former Atty. Gen., N. Warner Lee, Atty. Gen. by Stanley L. Patchell, Asst. Atty. Gen., Phoenix, for appellee.

Louis L. Deckter, Tuscon, for appellant.

CAMERON, Vice Chief Justice.

Defendant, Mark Daniel Kelly, was tried and convicted of rape while armed with a deadly weapon, § 13–611 and § 13–614(C) A.R.S., and burglary while armed with a deadly weapon, § 13–302 A.R.S. He was sentenced to a term of from ten to fifteen years imprisonment on each count, to run concurrently. From his conviction and sentence he appeals.

We are asked to answer the following questions:

1. Are Arizona rape statutes unconstitutional as a denial of equal protection?

2. Did the trial court err in denying defendant's motion in limine to preclude the prosecution from offering any evidence of subsequent acts committed by defendant?

3. Did the trial court err in refusing to suppress evidence found as the result of the issuance and execution of a search warrant?

4. Did the trial court err in refusing to admit certain F.B.I. reports?

5. Did the trial court err in admitting opinion evidence regarding the identification of footprints?

6. Did the trial court err in permitting an enlargement of a "mug shot" photograph to be introduced into evidence?

7. (a) Is the alibi rule, Rule 192(B), Rules of Criminal Procedure, unconstitutional?

 (b) Was the rule properly applied prohibiting the testimony of a witness as an alibi witness?

8. Did the trial court err in refusing to give defendant's requested instruction that in a rape case the jury is required to examine the testimony of the alleged victim with great caution?

The facts necessary for a determination of this matter are as follows. On the evening of 9 July 1972, the victim was home alone. She answered the door and a man asked her whether a certain person lived at that address. The porch of the house was well lighted and the victim talked to the man for about two minutes. The victim closed the door and returned to her bedroom. About two minutes later, the man who had been on the porch appeared at her bedroom door. He had a steak knife with a serrated edge and a wooden handle in his hand. He threatened the victim with the knife and raped her. After the man left, the victim waited a few minutes until she was sure he was gone and then went to a neighbor where she telephoned the Tucson Police and notified them of the incident.

The victim described the rapist to the police according to what he was wearing and what he looked like. She also stated that he had told her his name was "Mark." A composite drawing was made by the police based on the victim's description. Footprints were found at the rear and side of the victim's home and were photographed by the police.

One week after the rape, a police officer observed the defendant near the outside window of a motel. He cupped his hands around his eyes, peered into the window, and then walked away. When defendant was confronted by the officer he had no identification. However, he had a brown knife with a serrated edge and a wooden handle in his pocket. He was arrested and charged with trespassing and carrying a concealed weapon. The following day he was interrogated about the alleged rape and voluntarily agreed to appear in a lineup. At the lineup, at which the defendant appeared without an attorney, the victim identified Kelly as the one who raped her. Defendant was then arrested on the charge for which he was tried and convicted by a jury.

## 1. IS THE RAPE STATUTE UNCONSTITUTIONAL?

Defendant's first contention is that Arizona's rape statutes, §§ 13–611 through 13–614 A.R.S., violate the due process and equal protection clauses of the United States Constitution and are therefore unconstitutional. Defendant argues that the statutes make it a crime for a man to commit a sexual act upon a woman without her consent while a woman, however, who commits the same sexual act upon a man without his consent, cannot be charged with the crime of rape. A fair reading of our statutes, §§ 13–611 through 13–614 A.R.S., indicates as defendant contends—that other than as an aide and abettor, State v. Carter, 66 Ariz. 12, 182 P.2d 90 (1947)—a female can only be the victim of a rape not the perpetrator.

In determining whether a law violates the equal protection clause, three things are considered: the character of the classification in question; the individual interests affected by the classification; and the government interest asserted in support of the classification. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

The Fourteenth Amendment does not deny a state the power to treat different classes of persons in different ways as long as the classification is reasonable. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); In re Maricopa County Juvenile Action, No. J–72804, 18 Ariz.App. 560, 504 P.2d 501 (1973). And the Fourteenth Amendment does not deny a state the power to classify in the adoption of police law, Uhlmann v. Wren, 97 Ariz. 366, 401 P.2d 113 (1965); State v. Sanchez, 110 Ariz. 214, 516 P.2d 1226 (1973); State v. Cassius, 110 Ariz. 485, 520 P.2d 1109 (1974), and a legislative classification will not normally be set aside if any set of facts rationally justifying it is demonstrated to or perceived by the courts. United States v. Maryland Savings Share Ins. Corp., 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970).

In the instant case, we believe that the need for treating males and females differently in enacting the rape statute is clearly reasonable. The statute satisfies the real, if not compelling, need to protect potential female victims from rape by males.

However, for obvious physiological as well as sociological reasons we perceive no need by males for protection against females from rape which would be sufficient to demand legislative attention. The fact that the law does not provide the same protection to males as it does to females does not deny the male perpetrator the equal protection of the law. The classification is logical and rational. The individual's as well as the government's interests are apparent. We do not find the statutes constitutionally infirm.

## 2. DID THE TRIAL COURT ERR IN FAILING TO GRANT DEFENDANT'S MOTION TO PRECLUDE EVIDENCE OF THE ALLEGED TRESPASS AND CARRYING A CONCEALED WEAPON?

Defendant filed a motion in limine to preclude the State from offering any evidence of the alleged charges of trespass and carrying a concealed weapon. The court denied the motion.

Defendant contends that the evidence of these acts was inadmissible because there was no felony conviction and also because the evidence could only be described as "peeping-Tom" acts and as such are inadmissible in a rape prosecution. State v. Gibson, 103 Ariz. 428, 443 P.2d 424 (1968). At the trial the defendant was willing to concede that the knife was his.

In State v. Gibson, supra, we held that the testimony of the officer that the defendant had admitted that he was a "peeping-Tom" was reversible error. In Gibson, supra, we stated:

"Gibson complains of Officer Field's testimony that Gibson admitted to being a 'peeping Tom'. * * *

"Such evidence of misconduct by the defendant plainly constitutes prejudicial and reversible error. We held in State v. Johnson, 94 Ariz. 303, 383 P.2d 862, 863, that specific acts of misconduct not sustained by a conviction of a felony may not be shown and cited the prior Arizona cases. * * *

" * * * In the instant case, there is obviously no relevant connection between an act of a 'peeping Tom' and an act of violent rape. * * *" 103 Ariz. at 430, 443 P.2d at 426. See also State v. Washington, 103 Ariz. 605, 447 P.2d 863 (1968).

There are, however, exceptions to this rule. For example, when the evidence tends to establish intent, absence of mistake, or accident, identity, and common scheme or plan, it may be admissible even if the evidence also shows evidence of misconduct or prior bad acts. State ex rel. Moise Berger v. Maricopa County, 108 Ariz. 396, 499 P.2d 152 (1972); State v. Fierro, 107 Ariz. 479, 489 P.2d 713 (1971); State v. Jacobs, 18 Ariz.App. 471, 503 P.2d 826 (1973).

In the instant case, we have evidence which shows, we believe, common scheme, plan or design. State v. Phillips, 102 Ariz. 377, 430 P.2d 139 (1967). The peering into the motel window and the possession of the steak knife were facts which were relevantly connected with the acts for which the defendant was being tried. The footprints outside the window could indicate that the defendant was peering in the victim's house prior to the rape and the steak knife in defendant's possession was similar to the one the victim testified the defendant used at the time of the rape.

Also, we have stated:

"When one further considers the wide discretion left to the trial court in admission of separate criminal acts, State v. Finley, 85 Ariz. 327, 338 P.2d 790 (1959), there can be no doubt that the trial court must be upheld on admitting evidence of the student's rape." State v. Fierro, supra, 107 Ariz. at 483, 489 P.2d at 717.

We hold that the trial court did not err in denying defendant's motion in limine.

## 3. SUPPRESSION OF EVIDENCE

A search warrant was issued on the affidavit of a detective of the Tucson Police Department. This was done after the victim had identified the defendant in the police lineup. In the affidavit the detective stated that in the course of his investigation involving the rape, the victim "described the shirt worn by her assailant and the knife he was carrying to threaten her with, and had identified this assailant as Mark Daniel Kelly. It is believed that the shirt and knife are located in the above-described residence, this being the residence of Mark Daniel Kelly."

The affidavit indicated the following items which the officer believed would be found in defendant's residence:

"1. NAVY BLUE DUNGAREE CUT OFFS.

"2. NAVY BLUE AND MAROON 1½" HORIZONTAL STRIPED T-SHIRT.

"3. ONE PAIR OF MAN'S TENNIS SHOES WITH HORIZONTAL LINES & DIAMOND PATTERN.

"4. STEAK KNIFE WITH BROWN HANDLE 4' 7" BLADE."

■ Defendant contends that the affidavit did not give the magistrate probable cause to believe a search warrant was justified. We disagree.

The magistrate could determine from the affidavit that the defendant had been identified by the victim, that certain clothing had been identified and that the place to be searched was the residence of the defendant in which the specifically described clothing was likely to be found. The affiant stated the underlying circumstances which would justify a reasonable belief that the place to be searched contained evidence that would connect the accused with a crime that had been committed. State ex rel. Flournoy v. Wren, 108 Ariz. 356, 498 P.2d 444 (1972).

We agree with the statement of our Court of Appeals in State v. McMann, 3 Ariz.App. 111, 412 P.2d 286 (1966):

"In reviewing the required showing of probable cause upon which the issuance of a search warrant may be founded, the Supreme Court has observed that evidence is acceptable which is of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and the judicial determination will be upheld if there was 'substantial basis' for the magistrate's finding of probable cause. Searches pursuant to a warrant are given such preference that our highest court has indicated that a search under a warrant in a marginal case may be sustainable where without one it would fail. Jones v. United States, supra." 3 Ariz. App. at 112–113, 412 P.2d at 287–288.

■ Defendant also argues that the affidavit was faulty in that it did not state the time when the crime occurred, and further that too long a time had elapsed between the time of the crime and the obtaining of a search warrant. Only eight days had elapsed from the time of the rape until the affidavit was presented to the magistrate. The police could not request a search warrant until they felt they had sufficient evidence to support probable cause and they did not have this evidence until the defendant was arrested and identified by the victim. The items sought were defendant's clothing. Because of the nature of the items, the normal inference would be that they would still be found in the defendant's residence eight days later. While the better practice would be to state in the affidavit the date of the crime, neither our statutes, § 13-1441, et seq., A.R.S., nor the cases cited by counsel require that this omission render the affidavit defective.

We hold that the search warrant was a valid warrant based upon probable cause and the items seized were admissible into evidence.

## 4. F.B.I. REPORT

Shortly after reporting the incident to the police, the rape victim was examined by a medical doctor who combed the victim's pubic area for foreign pubic hair. After the defendant was arrested a week later, his pubic area was also combed for foreign pubic hairs. The hairs obtained in these two combings were sent to the F.B.I. laboratory and the examination by the F.B.I. laboratory indicated no foreign pubic hairs in either sample. The defendant attempted to introduce the F.B.I. report into evidence and the trial court sustained the county attorney's objection because of insufficient foundation.

■ The evidence offered was negative evidence that sexual intercourse actually took place. The reception of negative evidence is largely within the discretion of the trial court and is generally dependent upon the extent of its probative value:

"On cross-examination of the officer who arrested appellant, defense counsel asked questions designed to show that appellant's house had been searched after the arrest and no contraband found therein. The court sustained an objection that the line of inquiry was immaterial. The same objection was sustained as to proffered testimony by appellant's wife regarding a search of the house. The theory of admissibility was that if the house was searched and no contraband was found, this is 'negative evidence' of appellant's innocence in that it would be 'strange that he had the exact number of amphetamine sulfate tablets on his person with no apparent source of supply * * *.' The acceptance or rejection of such 'negative evidence' is largely within the discretion of the trial court. The general rule is that 'negative evidence lacking in probative value is properly excluded as too speculative in nature.' (People v. Mehaffey (1948) 32 Cal.2d 535, 555, 197 P.2d 12, 24.) * * * The judge did not abuse his discretion in excluding the evidence in question." People v. Heredia, 257 Cal. App.2d 862, 866–867, 65 Cal.Rptr. 402, 405, (1968).

And, in a case concerning fingerprints, the Illinois appellate court has stated:

"An abandoned car which matched the general description of the car involved in the shooting (a red 1964 Chevrolet) was found in the vicinity of the crime and was dusted for fingerprints. Defendant contends that he was wrongfully denied the opportunity to introduce evidence that the prints found did not match his. The test of admissibility of evidence is whether there is a connection between the facts proved and the crime charged. (citations omitted) Here, there was absolutely no evidence that the abandoned car found in the vicinity of the shooting was the same one involved in the crime. The ruling of the trial judge to exclude this evidence, then, was proper since the fact that defendant's fingerprints were not found in the abandoned car proves nothing with respect to his guilt or innocence in this case." People v. Hairston, 10 Ill.App.3d 678, 685, 294 N.E.2d 748, 753 (1973).

■ In the instant case the samples taken from the defendant's pubic area one week after the alleged incident clearly had no probative value and was properly excluded from admission. As to the sample taken from the pubic area of the victim, we have a more difficult question. If there was a strong probability that pubic hairs of the assailant would be found in the pubic area of the victim shortly after the rape, this was not shown. No evidence was presented from which the court could reasonably conclude that it was probable that pubic hairs would have been exchanged during the incident. Under these circumstances, the absence of the defendant's pubic hairs in the pubic hairs of the victim proved nothing either for or against the defendant and the trial court was not in error in excluding the offered evidence.

## 5. FOOTPRINTS

After the rape was reported to the police, a search of the premises was made and photographs were made of footprints outside the house. Thomas A. Delaney, an F.B.I. agent trained in identification of shoe prints, testified over defendant's objection, that the tennis shoes found in the defendant's closet probably made the footprints found outside the victim's home. At the hearing outside the presence of the jury, Agent Delaney testified as follows:

"Q All right. When you refer to point of wear being in the same location, point of wear ending at the same point, when you say the same, is that a measured point?

"A Not precisely, because the—I have never seen a photographed shoe print duplicate precisely the shoe involved, but for practical purposes, I would say yes, they end in the same areas.

"Q All right. So approximately, if you recall right offhand, how many points of similarity do we have?

"A Well, would be the size, the design, the discontinuance of the hash marks would be another point of similarity, the wear on the ball of the foot would be a similarity that you might refer to as a multiple similarity in the same position and the same extent and the same goes for the discontinuance of the hash marks up along the side of the shoes would be also what one might cite as a multiple similarity in that extent and position where the hash marks end.

"Q All right. Based on your observations and the results that you obtained from examining the two, do you have an opinion as to whether or not the shoe in question made the foot prints depicted in these photographs?

"A My opinion would be that since there is no way which I can compare every single shoe of this size and design with this print, but nevertheless, considering the points which I found similar, it would be my opinion that in all probability this right shoe made this photographed shoe print.

"Q Calling again on your experience with respect to the one particular characteristic that you noted and that being the characteristic of the missing one on the size of the shoe, during the course of your examination throughout the past, have you had occasion to run into that particular similarity before?

"A No, I find this similarity most unusual because when a number is disturbed or erased, you might say, it is due to a general wearing of the shoe, in other words, the whole shoe will wear down, but in this instance the size of the shoes are still elevated, which would ordinarily raise that shoe off the ground and protect the number, so in this instance, it is a most unusual wear characteristic."

Defendant contends that the trial court erred in admitting this evidence because proper foundation had not been laid. It is argued that strict standards are necessary to introduce footprint evidence and the trial court applied lax standards which resulted in the admission of evidence prejudicial to defendant. The trial court ruled that defendant's objection went to the weight of the evidence and not to the admissibility and therefore the evidence was admissible.

While we agree that footprint evidence is not as solid or reliable as, for example, fingerprint evidence, [see United States v. Buck, 449 F.2d 262 (10th Cir. 1971)] we believe the evidence was properly admitted. The witness's qualifications as an expert were established. The witness stated all the facts observed by him in comparing defendant's tennis shoe with the footprint. He then gave his opinion, as an expert, as to whether the defendant's shoe probably made the footprint. The lack of exactness in the opinion went to the weight the jury could give the evidence and not to its admissibility.

Whether a witness is competent to testify as an expert is a matter for the trial court to determine and such determination will not be overruled unless there has been a clear abuse of discretion. City of Phoenix v. Schroeder, 1 Ariz.App. 510, 405 P.2d 301 (1965).

## 6. "MUG SHOT" PHOTOGRAPHS

When defendant was arrested, a photograph was taken of him with prison clothes on. An 8x10 enlargement of this picture was made with all but the top part of the

number plate under the defendant's face showing. The numbers were not visible but the top of the plate was.

At the trial the victim made a positive and unhesitating in-court identification of the defendant. After identifying a composite picture made under her direction by the Tucson Police Department, the victim identified the clothes the defendant wore at the time of the offense and identified the knife found on the defendant at the time of his arrest as similar to the one used at the time of the offense. The following transpired:

"Q All right. Calling your attention now to the item marked State's Exhibit Number 7 for identification, can you tell me what that is?

"A Yes, it's a photograph of the Defendant.

"Q Is that photograph a fair and accurate representation of the Defendant as he appeared that night?

"A Yes, it is.

"Q Does that resemble the way he appeared that night, or is it accurate as to how he appeared that night?

"A Yes, it is.

"MR. NEELY: Your Honor, I'm going to offer State's Exhibit Number 7 at this time.

"MR. DECKTER: May I approach the Bench, please.

(THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH OUT OF THE HEARING OF THE JURY)

"MR. DECKTER: Your Honor, unless Mr. Neely can show the circumstances under which this particular photo was taken, it was taken on or about the 9th of July, and further match the photograph so that there would be no indication to the Jury that this is a mug photo blown up, which is indicated by the top part of the number plate that is directly under the chin of the Defendant, we'll object to this photo being admitted as without sufficient foundation, and further, because of the evident characteristic that it is taken in prison clothing and without showing the circumstances under which it was actually taken if not the evening of July 9th; that it would be too prejudicial to place before the Jury at this time.

"MR. NEELY: If the Court please, Your Honor, I think the law is quite clear with respect to the foundation necessary to lay, unless the photograph is of the subject, type, or character that it can be easily interpreted as a misrepresentation of the actual subject of the photograph, the only necessity for foundation is, that is required to be laid, is that it is a fair and accurate representation of the item portrayed in the photograph.

With respect to the top of the plate, I'll be happy to take the Clerk's scissors right now and cut that part off, if that will suit counsel.

"MR. DECKTER: Your Honor, I don't believe this photo was taken on or about the 9th.

"THE COURT: Doesn't have to be, ridiculous. Overruled, it may come in. You don't have to cut it off either."

 The introduction into evidence of mug shots, or the mention of the fact that defendant had mug shots taken prior to the arrest in the case at trial, can be error when they infer that the defendant has a prior arrest record. We have stated:

"Defendant contends that it was error to have this 'mug shot', obviously taken some time before the crime for which he was on trial, admitted in evidence and shown to the jury. The jury was also told that the photograph was taken some two months before the crime for which he was being tried.

"We have had occasion to rule on the use of the term 'mug shot' by a police officer testifying at trial. In that case, even though the mug shot was not shown to the jury, we held that the use of the term by the police officer was re-

versible error, stating the words 'mug shot' could lead the jury to only one conclusion—that the defendant had been previously arrested:

> 'The testimony of the officer using the term "mug shot" was prejudicial error which requires a new trial.' State v. Jacobs, 94 Ariz. 211, 214, 382 P.2d 683, 685 (1963).

"Our Court of Appeals has more recently reversed a conviction in a case wherein a mug shot was admitted in evidence at trial with tape covering the numbers. The Court of Appeals stated:

> 'It is this Court's opinion that the double-shot picture with front and profile alongside each other, unless disguised so as not to appear to be a "mug shot", and absent an explanation that the picture was taken at defendant's arrest on the charge involved, intimates to the jury that defendant had a prior criminal record.' State v. Cumbo, 9 Ariz.App. 253, 256, 451 P.2d 333, 336 (1969).

"Although the mug shot admitted in the instant case was scissored to remove the numbers from the photograph, the testimony indicated it was taken before his arrest and we hold that its admission was prejudicial error. State v. Jacobs, supra, and State v. Cumbo, supra." State v. Moore, 108 Ariz. 215, 219, 495 P.2d 445, 449 (1972).

▮ In the instant case, the picture was introduced by the prosecution after the defendant had been positively identified. The introduction of the enlarged "mug shot" served no useful purpose in further identifying the defendant. The fact that the top of the number plate was retained in the enlargement of the mug shot as well as the refusal of the county attorney to agree to have it made clear to the jury that the picture was taken after the arrest in this case leads to a strong inference that the prosecution was not introducing the picture for mere identification but for the purpose of improperly inferring to the jury that the defendant had a prior record. Such over-reaching by the prosecution is the stuff that reversals are made of and was clearly error. While we do not approve, we believe that the error was harmless. The evidence was more than sufficient that, without this picture, the jury would have reached the same decision. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L. Ed.2d 284 (1969); State v. Jackson, 109 Ariz. 559, 514 P.2d 480 (1973).

7. IS THE ALIBI RULE, RULE 192(B), RULES OF CRIMINAL PROCEDURE, UNCONSTITUTIONAL? WAS THE RULE PROPERLY APPLIED IN PROHIBITING THE TESTIMONY OF A WITNESS AS AN ALIBI WITNESS?

▮ The defendant filed a notice of intention to claim an alibi as a defense pursuant to Rule 192(B) of the Rules of Criminal Procedure in effect at the time this matter was commenced. Denise Smith, one of the witnesses listed by the defendant as an alibi witness, testified that she had been talking to the defendant on the telephone at about the time the victim alleged she had been raped. This evidence was cumulative. The defendant's father and sister, listed as alibi witnesses, testified that the defendant had talked to Denise Smith on the telephone on the evening of the alleged crimes. The defendant endeavored to introduce testimony from Denise Smith's brother, Robert Smith, that he heard his sister talking to defendant on the telephone. Robert Smith was not listed as a witness.

Defendant asserts that it was error to prohibit such testimony because Rule 192(B) was unconstitutional as a denial of due process. Defendant cites Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L. Ed.2d 82 (1973) in which the United States Supreme Court held a state statute similar to our Rule 192(B) which requires that a criminal defendant give pretrial notice of alibi, together with identity of his alibi witnesses, is a denial of due process unless the state is also required to reveal the

names of rebuttal witnesses. Trial in this matter was held starting 15 January 1973. Wardius v. Oregon, supra, was handed down by the United States Supreme Court on 11 June 1973, and, absent a United States Supreme Court decision to the contrary, we see no reason for applying it retroactively.

## 8. INSTRUCTIONS

The defendant requested and the trial court refused to give the following instruction:

"You are instructed that a charge such as made against the defendant in this case is one which, generally speaking, is easily made, and once made, difficult to disprove even if the defendant is innocent. From the nature of the case such as this, the alleged victim and the assailant usually are the only witnesses. Therefore, I charge you that the law requires that you examine the testimony of the alleged victim with great caution."

The court did give the following instruction on credibility of witnesses:

"You are the sole judges of the credibility of the witnesses. In determining the weight to be given to the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any motive or prejudice he may have, any inconsistent statements he may have made, and the credibility of his testimony considered in light of all the evidence in the case."

Defendant cites State v. Money, 110 Ariz. 18, 514 P.2d 1014 (1973) as authority for his contention that the refusal to give the requested instruction constituted reversible error. In Money, supra, we upheld the refusal to give the requested instruction in a case in which the defendant was charged with assault with a deadly weapon charge. We said:

"Such a cautionary instruction has been customarily given in rape cases, People v. Nye, 38 Cal.2d 34, 237 P.2d 1 (1951). But the peculiar circumstances attendant to the crime of rape which may justify the

instruction clearly are not present in the case before us." 110 Ariz. 18, at 26, 514 P.2d 1014 at 1022.

We find no error in the instruction not being given under the facts of the instant case. The defense was not consent but alibi, or that the event never took place. Evidence was presented that corroborated the testimony of the victim. The victim described clothing worn by the rapist. Clothing fitting this description was found in the defendant's apartment. Defendant's tennis shoe footprints were found outside the home of the victim the morning after the rape. A knife similar to the one described by the victim was found in defendant's possession. The victim's identification of the defendant was positive, and any reasons why the vicitm's testimony should be received with greater caution appear to be lacking in this case.

The refusal to submit the defendant's requested instruction was not prejudicial error.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD, and HOLOHAN, JJ., concur.