514 P.2d 1014

**The STATE of Arizona, Appellee,**

v.

**Willie Mitchell MONEY, Appellant.**

No. 2268.

Supreme Court of Arizona,
In Division.
Oct. 5, 1973.

Gary K. Nelson, Atty. Gen., by William P. Dixon and Ronald Crismon, Asst. Attys. Gen., Phoenix, and John A. Hudson, Law Student, University of Arizona, for appellee.

Finn, Finn & Wilkes, Ltd., by Galen H. Wilkes, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal by defendant Willie Money from jury verdicts of guilt to the crimes of kidnapping, § 13–491 A.R.S.; armed robbery, §§ 13–641 and 13–643 A.R. S.; and assault with a deadly weapon, § 13–249 A.R.S., and from judgments of guilt which were entered as to each of the aforementioned crimes and aggravated battery, § 13–245 A.R.S. Defendant was sen-

tenced to from five to seven years on each count, the sentences to run concurrently.

We must consider the following questions on appeal:

1. Was defendant denied his right to counsel when he was subjected to a pre-information lineup in the absence of counsel?

2. Was the pretrial lineup so prejudicial and suggestive as to taint the in-court identification of defendant by the victims of the crimes?

3. Did the trial court err in its failure to direct a verdict of acquittal?

4. Did the trial court err in denying defendant's request for a jury view of the scene of the crimes?

5. Is it a denial of due process for a defendant of the Negro race to be tried by an all white jury?

6. Did the court commit reversible error when it allowed the jury to separate after closing arguments, but before deliberation?

7. Was it error for the court to refuse certain of defense counsel's requested jury instructions?

8. Did the State fail to prove all of the elements of the crime of assault with a deadly weapon?

9. Was judgment of guilt to the crime of aggravated battery properly entered?

The facts necessary for a determination of this matter on appeal are as follows. In the early morning hours of 20 September 1969, Larry Jenkins and Mary Jo McManama (Mrs. Larry Jenkins by the time of the trial) were "parked" in an isolated area near South Mountain Park in Phoenix, Arizona. They had been there for some time when three men in a white Chevrolet convertible pulled up next to their car. After a preliminary introduction which consisted of asking various questions, the three men got out of their car and approached Larry and Mary Jo. One of the men pulled out a gun and demanded that Larry relinquish his wallet and jewelry and Mary Jo her purse. Both complied. The three men started to depart, but then, as what appears from the testimony to have been an afterthought, the gunman ordered the other two to "go get the girl."

Mary Jo was placed in the backseat of her asssailants' car and Larry was left behind. While enroute to unknown destinations the gunman sat directly in front of Mary Jo and counted the "profits." When it became apparent that the three had not realized all they had hoped to gain, the gunman made menacing remarks to the effect that Mary Jo would compensate for the difference. At one point he turned around and lifted Mary Jo's dress, but he was dissuaded from doing anything further by another of the three men.

In the meantime Larry had sped to the nearest telephone and had called the police. He reported the general details of the crimes and gave a description of the car in which Mary Jo had been kidnapped. It happened that a patrolman was in the vicinity, and he spotted a car traveling in the opposite direction which matched the description he had received over the radio. The patrolman turned around and pursued the car, but by the time he reached it the three assailants had fled on foot, abandoning both the car and Mary Jo.

The police separately questioned Larry and Mary Jo at the scene of the abandoned car. The record is not clear with respect to the descriptions of the three men recited by Larry and Mary Jo, but there appears to have been some variance between their respective descriptions as to height, build, and hair length. Both, however, described all three men as Negro and one as having had a mustache.

Later in the afternoon of that same day, Willie Money called the police to report that his car had been stolen the night before, a statement which, by his own admission, was false. He was told that the police had custody of his car, and that he should report to the police station to claim it. Upon arriving at the station Money was further informed that his car had been

involved in "some kind of trouble." In fact Money's car was the car which had been used by the assailants of Larry Jenkins and Mary Jo McManama. The officer in charge asked Money to participate in a lineup, and when he agreed, Mary Jo and Larry were immediately summoned to the police station.

The lineup consisted of four men including Money. All were of the Negro-race. They differed in height, build, and hair length, and Money was the only one of the four with a mustache. Larry and Mary Jo separately viewed the lineup and each independently identified Money as one of their three assailants and the one who had wielded the gun. Money was then arrested and charged with kidnapping, one count; armed robbery, two counts; assault with a deadly weapon, one count; and aggravated battery, one count. Count V of the information charging Money with aggravated battery was later dismissed.

The trial lasted for several days, during which period a great deal of conflicting testimony was elicited by both sides. Aside from the circumstantial evidence that Money's car was used during the commission of the crimes, the State's case was built solely on the foundation laid by the victims' identification. The defendant, on the other hand, attempted to present evidence of alibi. He maintained, in addition, that he had lent his car to three other men on the night in question, that it was they, and not he, who committed the crimes, and that the victims' identification of him was a mistake. The jury found Money guilty on all four counts.

## WAS DEFENDANT DENIED HIS RIGHT TO COUNSEL?

■ Defendant's first contention is that the decisions of the United States Supreme Court in the cases of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), should be construed to require the presence of counsel at a pre-information or pre-arrest lineup. The Wade and Gilbert cases held that a post-indictment lineup is a critical stage of the prosecution at which an accused is entitled to the assistance of counsel. More recently the United States Supreme Court has expressly held that the Wade-Gilbert rules are limited in application to critical stages of the prosecution, and that a pre-indictment lineup is not a critical stage. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed. 2d 411 (1972). We have stated:

"A counselless pre-complaint or pre-indictment (out-of-court) identification, if not unduly suggestive or otherwise tainted, is permissible under the decisions both of the United States Supreme Court, Kirby v. Illinois, 405 U.S. 951, 92 S.Ct. 1877, 32 L.Ed.2d 411, 1972, and of this court, State v. Dessureault, 104 Ariz. 380, 453 P.2d 951 (1969)." State v. Gering, 108 Ariz. 377, 379, 498 P.2d 465, 467 (1972).

We find no error.

## WAS THE LINEUP SUGGESTIVE?

■ Defendant next insists that the lineup was suggestive and tainted the in-court identifications. In keeping with Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), we must look therefore to the "totality of the circumstances" surrounding the identification procedure to determine whether the lineup was unduly suggestive. State v. Dessureault, op. cit.; Kirby v. Illinois, supra; State v. Gering, supra.

■ Defendant appeared in a lineup with three other men. (See Exhibit "A", a picture of the lineup.) It would appear that there were minor differences as to height, weight, and hair length. The defendant alone possessed a mustache, though not a large one. On the basis of that one difference defendant contends that the lineup was unduly suggestive. We

do not agree. Larry Jenkins testified at the motion to suppress:

"Q  Do you recall having conversation with Detective Flores about the line-up?

"A  He just said he had some people he'd like us to look at, and to take our time.

"Q  Who was with you at that time?

"A  My wife.

    *    *    *    *    *    *

"Q  Did he say anything else about the line-up?

"A  No. He just said he'd like us to look at them, and see if we could identify any of them.

"Q  Did he say anything about any people that were involved in the line-up?

"A  No.

    *    *    *    *    *    *

"Q  Could you describe how that was done; if anyone went in with you; how the line-up was conducted, to the best of your recollection?

EXHIBIT "A"

[A9200]

"A  Well, they took my wife in first, and she looked them over. Then, they brought her back out, and they kept us separated, and then they took me in, and I went in—I can't recall if it was Detective Flores, or not, but I went in with a policeman, and I wasn't supposed to speak, and there was a window in a door, and you looked through that, and there was four people in there.

"Q  Now, you say that they took your wife Mary Jo in first. What do you mean by that?

"A  Well, they took her in first to look at the people in the line-up.

"Q  Did they go through a doorway?

"A  Well, they went down a hallway, and then they turned right.

"Q  Could you see Mary Jo after she passed through the hallway to the right?

"A  No, because they took me into another room, and gave me a cup of coffee.

"Q  Did they close the door there?

"A  No, there wasn't any door. It's just a divider.

"Q  When was the next time you saw Mary Jo?

"A  After I identified.

"Q  Did anyone at any time indicate to you that any of the suspects, or any of the persons in the line-up had a car that was involved in the incident?

"A  No."

Mary Jo testified as follows:

"Q  Now, the day you went to the line-up, there was four men in the line-up, is that correct?

"A  Yes.

"Q  And only one fit the description of one of the perpetrators, is that correct?

"A  Well, I really didn't go by the description of how I described him.

It was just the face, the way he looked. It was him.

"Q  What was different about Willie than the other two men?

"A  Well, it wasn't so much is what was different. It was just that it was him. His face. He was the man."

The witnesses were looking for three men, two of whom did not have mustaches and who, according to the witnesses' general descriptions, could have matched the other three men in the lineup. Under the circumstances, the lineup was not unduly suggestive.

■ Defendant, in his brief, also complains that other extrinsic circumstances contributed to the suggestiveness of the lineup. Sometime after the victims had identified defendant, a police officer informed them that they had chosen the owner of the car which had been used by their three assailants. Defendant argues that that information was supportive of the victims' choice and that it lessened, if not completely eliminated, any doubt which the witnesses might have had. Mary Jo testified at the trial on cross-examination:

"Q  Just—yes, you have thought about that. And it's within the realm of possibility that even you could be mistaken?

"A  But I'm not.

"Q  But it could be. You've thought about that?

"A  If I what?

"Q  You've thought about that in your mind that there was a possibility that even you could be mistaken. Just answer that? Have you thought about it?

"A  Yes.

"Q  And sometime you were told that the automobile that was used the night that you were robbed and threatened was that belonging to the defendant, isn't that correct?

"A  A few days later.

"Q  It was told to you eventually, then?

"A  Yes.

"Q  Did that sort of convince you in your mind. That just added one more straw to convince you: Now, I'm sure this is really the man?

"A  No.

"Q  That didn't convince you in any way. That helped you to decide it?

"A  No."

We agree that information of that sort might tend to make a witness more certain of his identification especially if there were doubts concerning the identification before receiving the information. But having determined that the lineup was not suggestive in the first instance, we cannot say that the subsequent revelation derogated from an initially fair identification procedure or tainted the in-court identifications.

### DID THE TRIAL COURT ERR IN ITS FAILURE TO DIRECT A VERDICT OF ACQUITTAL?

■ A verdict of acquittal in a criminal case may be directed by the court sua sponte, and must be directed on motion by the defendant, but only if "the Court is of the opinion that the evidence is insufficient to warrant a conviction." Rule 270, Rules of Criminal Procedure (1956), 17 A.R.S. The clear import of Rule 270 is that it is not error for the court to refuse to direct a verdict where there is substantial evidence that the defendant has committed the crimes with which he is charged. State v. Stevens, 107 Ariz. 565, 490 P.2d 571 (1971); State v. King, 66 Ariz. 42, 182 P.2d 915 (1947). Each case necessarily turns, then, on what is or what is not to be considered substantial evidence. "Evidence is not insubstantial simply because the testimony is conflicting or reasonable persons may draw different conclusions therefrom." State v. Bearden, 99 Ariz. 1, 3–4, 405 P.2d 885, 886 (1965). In the case before us defendant asserts two arguments in fa-vor of his conclusion that the State's evidence could not support a conviction.

Defendant first contends that he produced two alibi witnesses who remained uncontradicted and unimpeached. A reading of the testimony, however, indicates that the two alibi witnesses, even if uncontradicted, did not negate the State's case.

The only witness who was able to testify to the time the crime occurred was the patrolman who rescued Mary Jo. He testified that he received the report of the incident at 3:25 in the morning of 20 September. In contrast, defendant's two "alibi" witnesses were only able to place defendant at home prior to midnight. One of the witnesses, defendant's father, testified that his son had arrived home at around 10 or 11 o'clock on the night of 19 September, and that he had gone to bed about an hour later. To bolster that testimony another witness, Mr. Matt Pennington, testified that he had driven defendant home at around 10 or 11 o'clock on a Friday night, but he was unable to state with certainty that it was Friday, 19 September. It seems clear that the testimony of those two witnesses did not establish an effective alibi. Rather, the effect of the testimony was such as to raise merely an inference that defendant was home in bed when the crimes were committed. While defendant may be correct when he asserts that the testimony was uncontradicted, even if accepted as true, the possibility that he later went out and committed the crimes in question is not eliminated thereby:

"* * * it must be shown that the defendants were so far removed from the place where the crime occurred that they could not, with ordinary exertion, have reached the place of the alleged crime in time to have participated therein, and * * * [the alibi] must cover the entire time during which the crime is alleged to have been committed. * * *" State v. Martin, 2 Ariz.App. 510, 515, 410 P.2d 132, 137 (1966).

■ We hold that the question of the alibi defense or its refutation thereof by

the State was properly submitted to the jury. State v. Moraga, 98 Ariz. 195, 403 P.2d 289 (1965). We therefore reject defendant's first argument.

■■■ Defendant secondly argues that the inconsistencies in the testimony of the State's identifying witnesses were so overwhelming as to have necessarily created a reasonable doubt concerning the accuracy of the identification. Since the State's case rested primarily on the victims' identification, defendant reasons that there was little evidence left to support a conviction. We have searched the record, and we are well aware that there was some inconsistency. However, it is the jury's function to weigh the evidence as a whole, to resolve any inconsistencies therein, and then to determine whether or not a reasonable doubt exists. So long as there is substantial admissible evidence for submission to the jury which could support a guilty verdict, we will not disturb the trial court's denial of a motion for directed verdict.

## DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S REQUEST FOR A JURY VIEW OF THE SCENE OF THE CRIME?

As we have heretofore indicated, the foundation of the State's case was the identification of the defendant by the victims of the crimes. The accuracy of the identification was consequently of paramount importance. Because the crimes took place at night in a relatively unlighted area, the defendant contends that the jurors should have been allowed to visit the scene of the crimes to judge for themselves one's ability to distinguish a face for purposes of identification. He asserts that the denial of his request for a jury view so prejudiced his case as to constitute reversible error.

■■■ View by a jury in a criminal prosecution is a matter within the trial court's sound discretion. State v. Prewitt, 104 Ariz. 326, 452 P.2d 500 (1969); Duke v. State, 49 Ariz. 93, 64 P.2d 1033 (1937). The key to when a jury view should be allowed lies in the purpose of Rule 265, Rules of Criminal Procedure (1956), 17 A.R.S., viz., to assist the jury in evaluating the evidence or in reaching a verdict. We are of the opinion that for a denial of a jury view to constitute an abuse of discretion, it must appear almost to a certainty that such denial deprived the jury of material assistance in evaluating the evidence and that such deprivation was in fact prejudicial to the defense. In the instant case, we do not believe that a view would have materially assisted the jury. On the contrary, because of the time of the year, the lighting and other possible changed conditions in the area, a jury view might have been misleading.

We conclude, therefore, that the denial of defendant's request for a jury view of the scene of the crime was not an abuse of the trial court's discretion.

## IS IT A DENIAL OF DUE PROCESS FOR A DEFENDANT OF THE NEGRO RACE TO BE TRIED BY AN ALL-WHITE JURY?

■■■ Defendant next asserts that he was denied a fair trial because he was not tried by a jury of his peers—that is, that there were no representatives of the negro community on the panel from which his jury was drawn. As we have heretofore consistently held, there is no merit to that argument in the absence of a showing that members of a particular race are systematically excluded from jury duty. State v. Taylor, 109 Ariz. 267, 508 P.2d 731 (1973); State v. Mahoney, 106 Ariz. 297, 475 P.2d 479 (1970), cert. den., 401 U.S. 917, 91 S. Ct. 898, 27 L.Ed.2d 818 (1971). See also State v. Mojarro Padilla, 107 Ariz. 134, 483 P.2d 549 (1971); State v. Kabinto, 106 Ariz. 575, 480 P.2d 1 (1971).

## DID THE COURT COMMIT REVERSIBLE ERROR WHEN IT ALLOWED THE JURY TO SEPARATE AFTER CLOSING ARGUMENTS BUT BEFORE DELIBERATION?

Defendant's trial lasted for several days. After counsel for both sides finished their

closing arguments, the court decided to allow the jury to separate as follows:

"THE COURT: Ladies and gentlemen, concerning the length of this trial, and the complexities of this case, I'm inclined to send you home tonight and let you deliberate tomorrow. You've been here all day, and I'm not sure it's a good idea for a Jury to deliberate at this time of day after listening to lawyers and witnesses. So we're going to recess until tomorrow morning.

\* \* \* \* \* \*

"MR. VAN BAALEN: I object to the Jury being excused as being unfair to the defendant.

"THE COURT: Counsel wants to know if you would rather deliberate tonight or tomorrow morning.

"A JUROR: Tomorrow morning. Much rather tomorrow. Awful tired.

"MR. VAN BAALEN: Why don't you take a vote.

"THE COURT: That's my feeling. I'm tired. We'll recess until tomorrow at 9:30. You've heard the arguments, you've heard all the evidence, and do not discuss the case with anyone, and you wait until you hear the Court's instructions tomorrow as to the law. I think at this stage you can't help but be thinking about the case, but you really can't do it intelligently as Jurors until I've explained the law to you. Again, please don't go out to the scene of the crime to see what happened and we'll try to start promptly tomorrow morning at 9:30."

Defendant has made no showing that any individual juror was improperly influenced or that he was prejudiced by allowing the jury to separate before being instructed. The decision of whether or not a jury shall be allowed to separate or be sequestered at any time before the case is finally submitted to them is within the discretion of the trial court unless the defendant requests in writing that the jury be kept together. Rule 268, Rules of Criminal Procedure (1956), 17 A.R.S.; State v. Blevins, 106 Ariz. 405, 476 P.2d 860 (1970). Because the defendant failed to make a written request and because there was no showing of prejudice, we find no error.

## WAS IT ERROR FOR THE COURT TO REFUSE DEFENSE COUNSEL'S REQUESTED JURY INSTRUCTIONS, NOS. 2, 3, 6, 7, 8, AND 9?

Defendant also claims that it was error for the court to refuse his requested jury instructions, numbers 2, 3, 6, 7, 8, and 9, but he has offered no guidance as to where the error lay. We have studied each of the requested instructions and we have found that the substance of each was included in the actual instructions given by the court, with the exception of instruction 8.

By instruction 8 defendant requested that the jury be advised as follows:

"A charge such as that made against the defendant in this case is one which is easily made, and once made, difficult to defend against, even if the person accused is innocent. Therefore, the law requires that you examine the testimony of the victims named in the information with caution."

Instruction No. 8 is not an accurate statement of the law. There is no reason why a victim's testimony should be received with greater caution than any other testimony. See State v. Chatman, 109 Ariz. 275, 508 P.2d 739 (1973). Such a cautionary instruction has been customarily given in rape cases, People v. Nye, 38 Cal. 2d 34, 237 P.2d 1 (1951). But the peculiar circumstances attendant to the crime of rape which may justify the instruction clearly are not present in the case before us. We conclude, then, that the court did not err in denying defense counsel's requested jury instruction No. 8 or any other.

## DID THE STATE FAIL TO PROVE ALL OF THE ELEMENTS OF THE CRIME OF ASSAULT WITH A DEADLY WEAPON?

■ Finally, defendant asks us to change a rule of law which has been of longstanding duration in this jurisdiction. He urges that we overrule Territory v. Gomez, 14 Ariz. 139, 125 P. 702 (1912), in which this court held that where a defendant is charged with the crime of assault with a deadly weapon, and the alleged deadly weapon is a gun, the State need not prove that the gun was loaded. Rather, it is a matter for the defense to show that the gun was unloaded, and hence not deadly. We have followed that rule of law in several cases since Gomez, State v. Gregory, 108 Ariz. 445, 501 P.2d 387 (1972); State v. Aldrich, 75 Ariz. 53, 251 P.2d 653 (1952); Lee v. State, 27 Ariz. 52, 229 P. 939 (1924); Gonzalez v. State, 21 Ariz. 385, 188 P. 872 (1920), and we have been given no persuasive reason for retreating from our position. Instead we find that the reason for the rule announced by the Gomez court is as cogent now as it was in 1912:

> "It is not the purpose of this court to draw nice distinctions and announce a technical rule when such a technicality could only have the effect of encouraging the bully to intimidate whom he pleases with a show of apparent deadly force and escape a merited punishment for his unlawful act, thus embarrassing the due administration of justice." 14 Ariz. at 143, 125 P. at 703.

### AGGRAVATED BATTERY

■ Prior to trial the State moved to dismiss Court V of the information charging defendant with aggravated battery. Defense counsel made no objection and the court ordered that the charge be dismissed. Only the four remaining counts were submitted to the jury, and the jury returned verdicts only as to those four counts. Judgment, however, was pronounced with respect to all five counts of the original information. Since defendant was never tried for aggravated battery, that portion of the judgment which pronounces him guilty thereof must be set aside.

Judgments affirmed in part and reversed in part.

HAYS, C. J., and STEVENS, Court of Appeals Judge, concur.