526 P.2d 698

**STATE of Arizona, Appellee,**

v.

**Albert McDONALD, Appellant.**

No. 2842.

Supreme Court of Arizona,
In Banc.

Sept. 19, 1974.

Rehearing Denied Oct. 15, 1974.

**160**

Gary K. Nelson, Former Atty. Gen., N. Warner Lee, Atty. Gen., Moise Berger, Maricopa County Atty., and Joseph E. Abodeely, Deputy County Atty., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, Robert A. Hertzberg, Deputy Public Defender, John Foreman, Deputy Public Defender, Phoenix, for appellant.

LOCKWOOD, Justice.

Albert McDonald, the defendant in this case, was found guilty following a jury trial of armed robbery in violation of A.R. S. § 13–641 and § 13–643. He was sentenced to serve a term of from sixty years to life in the Arizona State Prison. Defendant now appeals from both his conviction and sentence.

The record reveals that on December 4, 1970, Dr. Cohn, his wife, and four children were at their home in Phoenix. At approximately 7:00 p. m. the doorbell rang. Dr. Cohn opened the door and was pushed backwards by two men who were armed with pistols. The robbers herded the entire family into the master bedroom where they were forced to lie face down on the floor. The two gunmen who were joined by a third accomplice, bound up the members of the family. Next they proceeded to take whatever valuables they could find including those in a wall safe located in the bedroom closet. Before leaving, the robbers told the family to wait ten minutes after they left before calling the police and that if they gave the police their description, they would get the children because they knew where they went to school.

On May 11, 1973, after the defendant was already in custody, Dr. Cohn identified

the defendant at a photographic lineup as being one of the robbers. In separate line-ups given each of Dr. Cohn's two teenage sons, they both identified the defendant as being one of the robbers. In a pre-trial hearing on a motion to suppress the proposed in-court identification of the defendant, the father testified that he had not seen the defendant at any time since the robbery occurred and that he was 70 to 80 per cent certain of his identification of the defendant. After the robbery but prior to the photo lineup of May 11th, Dr. Cohn had seen one corporeal lineup and one photographic lineup and that neither lineup included the defendant. The two sons had seen neither the defendant nor viewed any lineup prior to the lineup they viewed on May 11, 1973. The pre-trial motion to suppress was denied and the doctor and his two sons were permitted to make an in-court identification of the defendant at his trial which began on May 14, 1973.

In addition to the eye witness identification of the defendant by three of the victims, the prosecution presented the testimony of three accomplices of the defendant who testified to the effect that the defendant was one of the robbers.

The defendant presented an alibi defense. The defendant along with his sister and her boyfriend, all testified that the defendant was in Oklahoma at the time the robbery took place in Phoenix. After hearing all the evidence, the defendant was found guilty of armed robbery by the jury. Defendant's motion for a new trial based upon numerous grounds was denied. Defendant then filed a timely appeal to this court.

## WAS DEFENDANT DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL?

It is defendant's first contention that he was denied his right to a speedy trial guaranteed to an accused by the Sixth Amendment to the United States Constitution. In order to address ourselves to the merit of this issue it is necessary to recite the sequence of events from the time the defendant was indicted until he was brought to trial.

The record indicates that the defendant was indicted by the Maricopa County Grand Jury on October 19, 1971, at which time an arrest warrant was issued. A fugitive warrant was forwarded to Oklahoma and the defendant was arrested the following day.

On November 12, 1971, the Governor of Oklahoma issued a warrant for the return of the defendant to Arizona to stand trial for armed robbery and two other charges. Defendant's attorney filed a writ of habeas corpus in the Oklahoma District Court seeking his client's release from custody under the fugitive warrants on November 16, 1971. The writ was denied on November 22, 1971, by the court. Appeal of the denial was taken on November 23, 1971.

On November 24, 1971, the defendant was charged with two counts of murder and one count of setting off an explosive device by the Oklahoma authorities.

The Governor of Oklahoma recalled his warrant of extradition on November 30, 1971, which he had issued on November 12th, pursuant to an agreement with the State of Arizona. It was stated that the warrant would be re-issued upon completion of the proceedings involving the three Oklahoma felony charges.

Due to numerous delays none of which were caused by the State of Arizona, the defendant did not go to trial on the first murder charge until January 8, 1973. On January 17, 1973, the defendant was acquitted by a jury. The remaining two charges were still pending on January 19, 1973, when the defendant filed motions to dismiss the three fugitive cases arising out of his activities in Arizona.

On February 2, 1973, a governor's Warrant was served on the defendant in connection with the Arizona cases. Three days later the defendant filed writs of habeas corpus. The hearing on the writs was set for February 14, 1973, but was postponed at the request of the defendant. At

that time the writs of habeas corpus were denied and the defendant was ordered released to the Arizona authorities. The defendant then appealed the denial but on March 13, 1973, his writ of mandamus was denied. The following day he was taken into custody by the Arizona authorities and returned to Arizona. Trial of the defendant commenced on May 14, 1973 in Maricopa County Superior Court.

■ The United States Supreme Court has set out the criteria for determining whether a defendant has been denied the right to a speedy trial in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In evaluating the various factors to be weighed by the court on appeal in determining whether there has been a deprivation of the right to a speedy trial, the court has identified four factors which must be taken into account: the length of the delay; the reason or cause of the delay; whether there was a waiver of the right by the defendant; and if there was any actual prejudice to the defendant because of the delay.

■ In addressing ourselves to the multiple factors to be assessed, we note that the defendant was indicted on October 21, 1971, and brought to trial on May 14, 1973. Thus there was a period of some eighteen months between the time the defendant was held to answer and the time he was brought to trial. The length of delay is perhaps the least conclusive of the factors, and as in the instant case where the delay is substantial, it acts merely as a triggering mechanism requiring an analysis of the other factors. Barker v. Wingo, supra.

The record in this case indicates that the cause of the delay was occasioned by the inability of the State of Arizona to extradite the defendant from Oklahoma. It is abundantly clear from the record of the proceedings that the defendant attempted in every way possible to prevent his extradition to Arizona. In addition the State of Arizona was unable to extradite the defendant due to the fact that the defendant first had to stand trial in Oklahoma on a charge of murder before he could be extradited to the State of Arizona. Under the provisions of the Uniform Criminal Extradition Act which both Arizona and Oklahoma have adopted:

"If a criminal prosecution has been instituted against such person under the laws of this state and is still pending the governor, at his discretion, either may surrender him on demand of the executive authority of another state or may hold him until he has been tried and discharged or convicted and punished in this state." A.R.S. § 13–1319; 22 Okl.St. Ann. § 1141.19.

It is clear that the State of Oklahoma chose to retain and try the defendant on a charge of murder rather than return him to Arizona. Thus the State of Arizona had no alternative but to respect the decision of the State of Oklahoma to retain the defendant until after he had been tried on the charge of murder.

■ The next factor to be analyzed is whether there was a waiver on the defendant's part of his right to a speedy trial. The fact that the defendant remained silent and did not demand that he be given a speedy trial cannot constitute a legal waiver of his right. Barker v. Wingo, supra. However the affirmative action on his part in attempting to block his extradition to the State of Arizona must certainly be construed as a waiver on his part of his right to a speedy trial.

■ The remaining factor is the prejudice to the defendant occasioned by the delay. In his brief the defendant alleges three possible areas of prejudice to his case. First he claims a lack of availability of witnesses for the defense. The only such witness the record reveals is his ex-wife who divorced him during the proceedings. However she was still available to testify in his behalf had he chosen to subpoena her which he did not. Thus we cannot see how the defendant was prejudiced by his voluntary refusal to call her as a witness.

Defendant also alleges that the delay may be responsible for the failure of some of his alibi witnesses to testify completely and clearly about the events which took place on the night of the robbery. We do not find this critical to the case of the defendant or that it impaired the ability of the trier of fact to determine his guilt or innocence. The case turned on whether the jury believed the defendant's alibi, which it did not.

Finally the defendant contends that the long period of pre-trial incarceration caused personal prejudice due to social and economic pressure brought to bear on him. While this court recognizes that all persons charged with a crime undergo prejudice due to social and economic pressures, this is wholly irrelevant to the issue of whether the defendant was denied his right to a speedy trial. Furthermore we note that the defendant's long period of incarceration was due to the fact he was unable to make bail on the Oklahoma charges.

After carefully balancing the factors, we must conclude that the defendant's right to a speedy trial has not been denied.

## WAS THE DEFENDANT DENIED A SPEEDY TRIAL AS REQUIRED BY RULE 236 OF THE RULES OF CRIMINAL PROCEDURE?

█ The trial of this case was prior to the adoption of the newly revised Arizona Rules of Criminal Procedure and was therefore governed by the then Rule 236 of the Rules of Criminal Procedure, 17 A. R.S. That rule provided that an accused must be brought to trial within sixty days from the time he was indicted or the prosecution must be dismissed unless good cause to the contrary is shown or unless the action has not proceeded to trial because of the defendant's consent or his actions.

It is the contention of the defendant that regardless of whether or not his constitutional right to a speedy trial has been violated, the case against him should have been dismissed due to the alleged violation of Rule 236. In discussing the previous issue we determined that the delay between the time the defendant was indicted until he was returned to Arizona was due to the fact that he had to first stand trial on an Oklahoma murder charge before he could be extradited and he attempted to resist extradition by every possible legal means. Therefore the trial could not be commenced due to a combination of good cause and the defendant's own actions.

The defendant was returned to Arizona on March 14, 1973, arraigned on March 19, 1973, and the trial commenced on May 14, 1973. Thus the defendant's trial commenced exactly sixty-one days after he was returned to this jurisdiction. A survey of the record reveals that the trial, originally set to commence on May 1, 1973, was largely delayed as a result of voluminous defense motions. While the presentation of such motions is unquestionably within the defendant's rights the presentation of an inordinate number or the necessity of lengthy arguments by counsel or examination of witnesses is relevant to the issue of whether the defendant shares responsibility for any minor delay. The record reveals that counsel for the defendant was admonished by the trial court several times during the presentation of these motions for resorting to unreasonably time consuming questioning of witnesses. Under the facts of this case we are not prepared to grant a reversal because of a possible one day violation of Rule 236.

## WAS IT ERROR FOR THE STATE TO IMPEACH THE TESTIMONY OF BOTH THE DEFENDANT AND DEFENSE WITNESSES BY PRIOR FELONY CONVICTIONS?

█ The defendant in his brief requests this court to overrule the well established rule allowing the impeachment of witnesses by disclosure of prior felony convictions. This we decline to do. We recent-

ly stated in State v. Mayes, 110 Ariz. 318, 518 P.2d 568 (1974) that:

"We had thought that the issue concerning the admission of a prior felony conviction for impeachment purposes was well settled in this jurisdiction. As recently as October of last year in State v. King, 110 Ariz. 36, 514 P.2d 1032 (1973) the admissibility of a prior conviction for impeachment purposes was upheld with this statement:

'We reaffirm our previous position that the rule which allows impeachment by prior felony convictions is not constitutionally defective. State v. Reeden, 106 Ariz. 409, 477 P.2d 240 (1970); State v. Fields, 104 Ariz. 486, 455 P.2d 964 (1969).' 514 P.2d at 1035.

"We see no reason to depart from the generally accepted rule in the great majority of jurisdictions nor does the appellant or the learned author of the majority opinion in the Court of Appeals decision in this case cite any persuasive authority to cause us to change our position." 518 P.2d at 568–569.

## WAS IT ERROR FOR THE TRIAL COURT TO ALLOW THE PROSECUTION WITNESS TO MAKE AN IN–COURT IDENTIFICATION OF THE DEFENDANT?

Prior to the start of the defendant's trial, two hearings were held pursuant to State v. Dessureault, 104 Ariz. 380, 453 P.2d 951 (1969). At the first hearing the purported in-court identification of the defendant by Mrs. Cohn was suppressed. The court ruled that the prosecution had failed to carry the burden of showing that her identification was not tainted. After the first hearing but prior to the start of the trial, photographic lineups were held for Dr. Cohn and each of his two sons. All three picked out the defendant's picture from a group of five photographs depicting middle-aged Caucasion males wearing glasses.

■ It is defendant's contention that the identification procedure was tainted

because defense counsel was not present during the three photographic lineups. The United States Supreme Court has ruled that there is no right to the presence of counsel at such post-indictment lineups, distinguishing them from corporeal lineups which constitute "a trial-like confrontation requiring the 'Assistance of Counsel' to preserve the adversary process by compensating for advantages of the prosecuting authorities." United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). The court in Ash went on to hold that:

"[L]ack of scientific precision and inability to reconstruct an event are not the tests for requiring counsel in the first instance. These are, instead, the tests to determine whether confrontation with counsel at trial can serve as a substitute for counsel at the pretrial confrontation. If accurate reconstruction is possible, the risks inherent in any confrontation still remain, but the opportunity to cure defects at trial causes the confrontation to cease to be 'critical'.

\*    \*    \*    \*    \*    \*    \*

"We hold, then, that the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." 413 U.S. at 316, 321, 93 S.Ct. at 2576, 2579, 37 L.Ed.2d at 630, 633.

■ Defendant also argues that the comment made by the officer conducting the lineup to one of the sons to the effect that he had picked the right man tainted the in-court identification of the defendant. While we do not approve of such a procedure, we have held that where the lineup is not suggestive in the first place, such subsequent comments cannot taint an initially fair identification procedure or the in-court identification. State v. Richie, 110 Ariz. 590, 521 P.2d 1136 (1974); State v. Money, 110 Ariz. 18, 514 P.2d 1014 (1973).

Finally the defendant argues that the in-court identification was tainted due to the fact that the witnesses viewed the defendant in handcuffs in the custody of police officers during the course of the trial. This contention is wholly without merit inasmuch as the witnesses did not see the defendant at any time prior to their identification of him at the photographic lineup. Based upon the previous discussion, we find that such incidents could not affect the initially fair lineup procedure or the subsequent in-court identification. For these reasons we find that the trial court did not err in permitting the witnesses to make their in-court identification of the defendant.

## WAS THERE CONCEALMENT OF EXCULPATORY MATTERS BY THE PROSECUTION?

Defendant alleges that certain matters contained in a police report were exculpatory and that it was withheld from the defense. The material in question concerned the investigating officer's report which contained comments from the youngest son who said that he had seen one of the suspects in the back yard of his home two weeks before the robbery but thought he was one of the workmen remodeling the home at the time. The seven year old daughter who did not testify, also said she had seen the man wandering about the yard.

Under the mandate of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defendant argues that his right to a fair trial was prejudiced. After a careful reading of the record, we find that the defendant's argument fails for two reasons. First the allegedly exculpatory matter was in fact disclosed to the defense for use at the trial. The matter was used by the defense for the purpose of cross-examining the prosecution witnesses. Secondly the matter was not exculpatory in nature. The officer who prepared the report designated the suspect as being "suspect number two". There is no showing that the boy was referring to the defendant as being

suspect number two which was merely the designation used by the investigating officer.

## WAS THE DEFENDANT PREJUDICED BY BEING VIEWED BY MEMBERS OF THE JURY OUTSIDE THE COURTROOM IN THE CUSTODY OF OFFICERS AND IN HANDCUFFS?

It is defendant's allegation that he was prejudiced because he may have been seen wearing handcuffs while he was being escorted to the courtroom from the county jail by officers. The defendant does not contend nor do the facts show that the defendant was manacled in the courtroom in the presence of the jury. Regarding this issue, this Court has stated:

"Appellant next contends his rights were prejudiced because he was handcuffed when he was brought to the courtroom and that the jury panel, standing out in the hallway, saw him with the handcuffs on. Neither appellant nor his counsel contends that he remained shackled during the course of the trial. So far as the record shows he was not manacled inside the courtroom, and what he complains of is the fact that he was moved from the jail to the courtroom with handcuffs on. It has long been recognized that a prisoner coming into court for trial is entitled to make his appearance free of shackles or bonds. However, exceptions to this rule have been made, and in such matters the conduct of the trial rests in the sound discretion of the court. Under the record in the instant case, there is nothing to show that the trial court abused this discretion or that the handcuffs were not removed as soon as safety would permit." State v. Sherron, 105 Ariz. 277, 463 P.2d 533, 535–536 (1970). See also State v. Boag, 104 Ariz. 362, 453 P.2d 508 (1969).

## DENIAL OF THE PRESENCE OF A "TALISMAN"

The defendant also contends that he was denied the assistance of a "talisman".

Specifically the counsel for the defendant complains that:

"After selection of the jury when counsel for this defendant sought to contact a talisman to sit in the court, observe, and confer with counsel for this defendant as to the progress of the trial, such talisman was accosted by said armed officers, taken to another area of the courthouse, searched, interrogated, and intimidated to the extent that said person left and was unable to aid counsel for this defendant in the trial of this case."

██ The transcript suggests that counsel for the defendant is referring to and misusing the word "talesman". Rather than connoting some type of magical charm, the latter term usually refers to a spectator in the courtroom or resident of the county called upon to fill in an incomplete jury or replace an excused or disqualified juror. State ex rel. Burton v. Smith, 174 Ohio St. 429, 189 N.E.2d 876 (1963); Pribyl v. State, 165 Neb. 691, 87 N.W.2d 201 (1957). Statements by defense counsel out of the jury's presence indicate that the allegation here amounts to little more than that one or more deputies may have been overzealous in enforcing the trial's tight security precautions:

"MR. SELLERS: Yesterday, a juror who was called on the first call, but not elected for this jury, returned to audit the trial and told me he was interested in it. I visited with him a little bit about his reaction to certain portions of the State's evidence.

"As soon as I finished talking to him he was set up by one or more of the deputies. I say 'set up'. He was approached and questioned very rigorously; told him they had a mug shot of him over in the Police Station or somebody that looked very similar and they wanted

to know all about his business and everything. The man was scared silly.

"THE COURT: This did not happen in the presence of the jury, did it?

"MR. SELLERS: No, your Honor."

We find no evidence in the record to indicate that this unnamed individual was prevented from attending the trial or forced to undergo any inappropriate security screening.

Regardless of what counsel for the defendant is attempting to assert, he cites no statutory or case law to indicate that the defendant's rights were abridged or that prejudice resulted from the absence of his "talisman".

## EXCESSIVE SENTENCE

██ Defendant's final contention is that the sentence of from sixty years to life was excessive under the circumstances of the case and an abuse of discretion. Defendant in his brief neglects to mention that the defendant had two prior felony convictions on his record. Also the trial judge was fully aware of the defendant's past history of criminal acts. The sentence imposed falls within the statutory limits. This court has stated on innumerable occasions that the trial court has broad discretion in sentencing the defendant and that the trial court is in the best position to evaluate the defendant's crime in light of the facts of the case and the defendant's background and character. State v. Cooper, 111 Ariz. 32, 523 P.2d 60 (1974); State v. Fischer, 108 Ariz. 325, 498 P.2d 147 (1972). This court will not disturb the sentence on appeal absent a clear showing of an abuse of discretion which we cannot find from the facts of this case.

Judgment and sentence affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER, and HOLOHAN, JJ., concur.