NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

BRANDON ROBERTS, *Appellant*.

No. 1 CA-CR 13-0343
FILED 5-1-2014

---

Appeal from the Superior Court in Maricopa County
No. CR2012-006709-002
The Honorable Cynthia J. Bailey, Judge

**AFFIRMED AS MODIFIED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist, III
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Paul J. Prato
*Counsel for Appellant*

_____

## MEMORANDUM DECISION

Judge Peter B. Swann delivered the decision of the Court, in which Presiding Judge Andrew W. Gould and Judge Jon W. Thompson joined.

_____

**S W A N N**, Judge:

¶1   Brandon Roberts appeals from his convictions and sentences for first-degree felony murder and attempted armed robbery, contending that the evidence was insufficient to support the convictions.[1]  We find sufficient evidence and therefore affirm, but we modify the judgment of conviction to omit the requirement that Roberts pay for the cost of DNA testing.

## FACTS AND PROCEDURAL HISTORY

¶2   M.R. died after suffering a gunshot wound to his head on an evening walk through a Phoenix park.  The ensuing police investigation led officers to conduct a video-recorded interview with Roberts the day after the shooting.  Roberts initially asserted that he had spent the evening at home with Nadeem Alferikh and other friends.  He stated that Alferikh had left for approximately an hour during the night because Roberts told him to get rid of a gun that Alferikh had brought with him.  As the interview continued, however, Roberts conceded that he and Alferikh had both gone to the park where M.R. was shot to "kill time" before meeting a friend to buy drugs.  Eventually, Roberts confessed that Alferikh had given him the gun and that they in fact had encountered M.R. at the park.  According to the 17-year-old Roberts, the 78-year-old M.R. had suddenly and without provocation "gotten in his face" and accused them of following him around the park.  Roberts had responded by pushing M.R. away from him.  When M.R. then "went for something behind his back," Roberts "got scared" because he had purportedly been threatened at gunpoint not long before and thought M.R. was going to pull a weapon on them.  Roberts explained that he had "freaked out," "overreacted" and shot M.R. in self-defense.

_____

[1] Roberts does not appeal his conviction and sentence for possessing a firearm while a minor.

¶3 The interviewing officer confronted Roberts by telling him that Alferikh had admitted that Roberts prompted Alferikh to check M.R.'s pockets after the shooting. Upon hearing this Roberts began crying but adamantly denied that he ever told Alferikh to do so or that they intended to rob M.R. Roberts nonetheless confessed that after he shot M.R., Alferikh independently rolled over M.R.'s body, patted down his pockets and unsuccessfully tried to open a fanny pack that M.R. wore at his back. Roberts further confessed that he and Alferikh thereafter ran away from the scene to a friend's apartment complex where they planned to buy drugs. When the friend did not show up, they returned to Roberts' home where Roberts hid the gun in the attic. Following the interview, the state indicted Roberts on one count of first-degree felony murder with attempted armed robbery as the predicate offense, one count of second-degree murder in the alternative, one count of attempted armed robbery, and one count of possessing a firearm while a minor.[2]

¶4 At trial, the state moved to admit the recorded interview without objection and played it for the jury. Among other witnesses, the state called a resident of an apartment complex close to the park where M.R. was shot. The resident testified that a couple of hours before the shooting she had witnessed Roberts participating in a verbal altercation at a nearby bus stop and shortly thereafter attempting to instigate an argument with another person across the street. The state also called a crime scene specialist who testified that M.R.'s fanny pack contained only a pair of binoculars, a flashlight and two $20 bills.

¶5 Roberts moved for judgment of acquittal at the conclusion of the state's case-in-chief. He argued that the state had failed to prove attempted armed robbery as an individual charge and as the predicate offense of the felony murder charge. The state responded by citing evidence that M.R. was reaching for a fanny pack at his back when Roberts shot him, and that immediately after the shooting Alferikh had searched M.R. and been unable to open the fanny pack. The state argued that it was reasonable to infer from that evidence that Roberts had been pointing the gun at M.R. and had demanded money without knowing that M.R. kept his money in the fanny pack, and then fired when M.R. reached for it. The court denied Roberts' motion.

¶6 Roberts testified in his defense. He stated that Alferikh had given Roberts the gun because Roberts feared for his life after being

_____

[2] Alferikh was indicted as a codefendant but his case was severed from Roberts' before trial.

threatened at gunpoint a week earlier, which he claimed to have reported to Phoenix police. Roberts confirmed that he and Alferikh had walked to the park to spend time before going to a friend's nearby apartment to buy drugs, and that he had more than $40 on him when they left for the park. Roberts then gave his account of the incident:

> Q. And walk us through what happened there?
>
> [Roberts]. After that [M.R.] came out of the wash and he started screaming at me and [Alferikh], saying we were following him and he keeps seeing us everywhere, and he comes at me, and that's when I pushed him back, and he stood screaming at me, and he gets at me again, and when I pushed him back the next time I revealed I had a pistol on me, and I said, "Please, leave me alone."
> . . . .
> Q. Tell us what happened next?
>
> [Roberts]. . . . that's when [M.R.] starts yelling at me "Yes, all right." And he starts reaching on the side to where he had this black thing on his hip. It could have been a holster or anything, and he's threatening, you know, "Why you want to do that," with these types of motions.
>
> Q. What did you do?
>
> [Roberts]. I fired.
> . . . .
> Q. And I want you to also tell us in your own words, did you see anything? If you can, describe what you saw?
>
> [Roberts]. Well, when he was reaching behind [him], it looked like he was pulling something from his waistband. It could have been a weapon. It looked like, not an entire object, but something from his side holster.

Roberts denied that he had approached M.R. with the gun to rob him or that he had checked M.R.'s property after shooting him. He further denied that he had been involved in any arguments close to the park before the shooting. Roberts also denied telling Alferikh to do anything after the shooting, though he conceded that Alferikh had walked over to M.R.'s body only seconds afterwards to supposedly look for the weapon they believed M.R. was attempting to pull on them. Contradicting his recorded interview statements, Roberts testified that Alferikh had not

actually searched M.R. and that he did not know whether Alferikh had trouble opening M.R.'s fanny pack before they ran away.

¶7            In rebuttal, the state called M.R.'s son who testified that M.R. would frequently walk the same route through the park on which he had accompanied him several times.  M.R.'s son further testified that M.R. would never walk through an underpass in the park from which Roberts claimed M.R. had emerged right before they encountered him.  According to his son, M.R. often carried money to give to people in the park who he thought needed help and would never confront someone who carried a gun or carry a gun himself.  Lastly, the state called the case agent of the M.R. investigation, who testified that he had not come across any Phoenix police report relating to an assault on Roberts the week before he shot M.R.

¶8            In closing, the state argued that the evidence showed that Roberts had committed "an attempted robbery . . . with deadly consequences."  The state invited the jury to consider the plausible reasons why M.R. would reach for his fanny pack if Roberts and Alferikh were not attempting to rob him and why Alferikh would immediately check M.R.'s pockets if that was not their plan beforehand.

¶9            The jury found Roberts guilty of all charges but the court did not enter judgment on the alternative second-degree murder charge according to the parties' earlier agreement.  Roberts moved for a new trial based on insufficient evidence, which the court denied.  The court ultimately sentenced Roberts to life imprisonment without the possibility of release for 25 years on the first-degree felony murder count, and imposed concurrent, presumptive prison terms of seven-and-a-half years and one year on the remaining counts.  Roberts timely appeals.

**DISCUSSION**

¶10           We review the sufficiency of the evidence de novo.  *State v. West*, 226 Ariz. 559, 562, ¶ 15, 250 P.3d 1188, 1191 (2011).  Sufficient evidence may be either direct or circumstantial, and may support differing reasonable inferences.  *State v. Anaya*, 165 Ariz. 535, 543, 799 P.2d 876, 884 (App. 1990). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *West*, 226 Ariz. at 562, ¶ 16, 250 P.3d at 1191 (citation omitted).  We do not reweigh the evidence or determine the credibility of witnesses, *State v. Williams*, 209 Ariz. 228, 231, ¶ 6, 99 P.3d 43, 46 (App. 2004), and we resolve all conflicts in the evidence against Roberts, *see State*

*v. Girdler*, 138 Ariz. 482, 488, 675 P.2d 1301, 1307 (1983). "To set aside a jury verdict for insufficient evidence it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987); *see also State v. Scott*, 113 Ariz. 423, 424-25, 555 P.2d 1117, 1118-19 (1976) ("Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction.").

¶11 "The essential elements of an attempted robbery are (1) intent to commit robbery and (2) an overt act towards that commission." *State v. Clark*, 143 Ariz. 332, 334, 693 P.2d 987, 989 (App. 1984); *see also* A.R.S. § 13-1001(A). Under A.R.S. § 13-1902(A),

> [a] person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property.

Robbery is elevated to armed robbery when the robber or an accomplice is armed with, uses or threatens to use a deadly weapon. A.R.S. § 13-1904(A). A person is liable as an accomplice to attempted armed robbery if, "with the intent to promote or facilitate the commission of [armed robbery]," he "[s]olicits or commands another person to commit [armed robbery]," "[a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing [armed robbery]," or "[p]rovides means or opportunity to another person to commit [armed robbery]." A.R.S. §§ 13-301, -303(A)(3). A person commits first-degree felony murder if "[a]cting either alone or with one or more persons . . . [he] attempts to commit . . . [armed] robbery . . . and, in the course of and in furtherance of the [attempted armed robbery] or immediate flight from the [attempted armed robbery], the person or another person causes the death of any person." A.R.S. § 13-1105(A)(2).

¶12 Relying on *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232 (1986), Roberts contends that the state failed to establish that he intended to commit armed robbery when he killed M.R., and that the evidence therefore was insufficient to support his convictions for attempted armed robbery as an individual charge and as the predicate offense of first-degree felony murder. In *Wallace*, our supreme court held that to support a factual basis for a defendant's plea to armed robbery, "there must be evidence establishing that defendant's intent to commit robbery was

coexistent with his use of force." *Id.* at 365, 728 P.2d at 235; *see also State v. Lopez*, 158 Ariz. 258, 264, 762 P.2d 545, 551 (1988) ("[T]he robbery statute requires the coexistence of an intent to commit a robbery with the use of force. If a murder is committed with no intent to commit a robbery, it is still murder but it is not armed robbery. If a theft is conceived of, and executed after a murder, it is a theft but it is not an armed robbery."). The court later clarified this rule in *State v. Comer*, where it held that "a robbery may . . . be established [even] when the use of force precedes the actual taking of property, so long as the use of force is accompanied with the intent to take another's property." 165 Ariz. 413, 421, 799 P.2d 333, 341 (1990). And in *State v. Tison*, the court concluded that

> [a]lthough a defendant's presence at the time and place of the crime in the absence of preconcert does not establish guilt as an aider, abettor or principal, an intent to engage in the criminal venture may be shown by the relationship of the parties and their conduct before and after the offense.

129 Ariz. 546, 554, 633 P.2d 355, 363 (1981) (citations omitted).

**¶13** Contrary to Roberts' contention, the record contains substantial evidence from which a rational juror could have found beyond a reasonable doubt that Roberts intended to commit armed robbery at the time he killed M.R. The state presented ample evidence to discredit Roberts' proclaimed self-defense motive for shooting M.R. A neighborhood resident testified that Roberts had instigated and participated in verbal altercations with others close to the park a couple of hours before the shooting. The case agent testified that he had not seen any Phoenix police report regarding an assault on Roberts the week before M.R. was shot, which was the reason Roberts offered for carrying a firearm and being scared when M.R. supposedly confronted him. M.R.'s son testified about M.R.'s nonthreatening character and habits. Moreover, the jury was free to assess the relative likelihood that a 78-year-old man walking alone in a park at night would suddenly confront and threaten two much younger and armed men. *See State v. Money*, 110 Ariz. 18, 25, 514 P.2d 1014, 1021 (1973) (holding that jury resolves witness credibility). By returning a guilty verdict on the alternative second-degree murder charge despite a self-defense instruction, the jury implicitly found that Roberts did not kill M.R. in self-defense.

**¶14** Having concluded that Roberts did not act in self-defense, a juror could reasonably infer that Roberts shot M.R. during the course of an attempted robbery. That inference is supported by Roberts' confession that only seconds after the shooting his friend Alferikh rolled over M.R.'s

body, patted down his pockets and tried to open his fanny pack. Although Roberts consistently denied telling Alferikh to check M.R.'s pockets, the jury watched his distraught reaction when the interviewing officer told him that Alferikh had admitted as much, and the jury could reasonably disbelieve Roberts' denial in light of the circumstances. Roberts admitted that he and Alferikh had spent the entire evening together, that Alferikh had given Roberts the gun he used to kill M.R., and that the two proceeded with their plan to buy drugs after the shooting and then hid the gun together in Roberts' home. The state also introduced testimony that M.R.'s fanny pack, which Roberts himself said M.R. was reaching for right before Roberts shot him, contained only money and personal property, and no weapons of any sort. It would be reasonable to infer that if M.R. could not have been reaching for a weapon, he must have been reaching for his fanny pack either to give Roberts its contents or to protect it from being taken.

¶15        We therefore conclude that the state presented sufficient evidence to support Roberts' convictions and sentences for first-degree felony murder and attempted armed robbery. However, though neither party raises the issue on appeal, our review of the record reveals that the court erred by ordering Roberts to "submit to DNA testing for law enforcement identification purposes and pay the applicable fee for the cost of that testing in accordance with A.R.S. § 13-610." *See State v. Henderson*, 210 Ariz. 561, 571 n.6, ¶ 39, 115 P.3d 601, 611 n.6 (2005) (Hurwitz, J., concurring) ("An appellate court may find fundamental error even if the issue is not raised on appeal by a defendant."); *State v. Reyes*, 232 Ariz. 468, 472, ¶ 14, 307 P.3d 35, 39 (App. 2013) (holding that A.R.S. § 13–610 does not authorize the court to impose a DNA testing fee on a convicted defendant); *State v. Provenzino*, 221 Ariz. 364, 369, ¶ 18, 212 P.3d 56, 61 (App. 2009) ("Imposition of an illegal sentence constitutes fundamental error that may be reversed on appeal, despite the lack of an objection in the trial court."); *Jackson v. Schneider*, 207 Ariz. 325, 328, ¶ 10, 86 P.3d 381, 384 (App. 2004) ("When a trial court exceeds its sentencing authority, the sentence is void as to the excess portion.").

## CONCLUSION

**¶16**	For the foregoing reasons, we affirm Roberts' convictions and sentences but modify the judgment of conviction to omit the requirement that he pay for the cost of DNA testing.



Ruth A. Willingham · Clerk of the Court
FILED: MJT